[No. 26150. *En Banc.* November 2, 1936.]

RALPH C. MACKEY, *Respondent*, v. UNITED CIVIL SERVICE TRAINING BUREAUS, *Appellant.*

*Harold W. Johnston* and *Longfellow & Fitzpatrick,* for appellant.

*Wright & Wright* (*Felix Rea,* of counsel), for respondent.

BEALS, J.—The plaintiff, Ralph C. Mackey, sued the defendant for a balance which he claimed due as

commissions for procuring students who enrolled in one or other of the study courses taught by defendant, which is an Oregon corporation, maintaining its main office at Portland. The action was tried to the court sitting without a jury, and from a judgment in plaintiff's favor for the amount sued for, defendant has appealed, assigning error upon the making of certain findings of fact; upon the refusal of the trial court to make several proposed findings of fact; upon the refusal of the trial court to render judgment in appellant's favor or grant a new trial; and upon the entry of judgment in favor of respondent.

During the month of September, 1934, appellant entered into a written contract with one Ray Davis, appointing Davis appellant's agent to open a branch school in Seattle, which contract, *inter alia,* vested in the agent authority to employ persons to solicit enrollments in the Seattle school. About six months later, respondent was employed by Davis and commenced to solicit students, in which work he continued until July, 1935. The cost of the courses to the student varied. Upon an enrollment for a sixty-nine dollar course, respondent was to receive eighteen dollars; for a seventy-five dollar course, his commission amounted to twenty dollars.

Respondent was furnished blank forms which the student was to sign, some of these showing appellant's address as Portland, Oregon, others bearing the school's Seattle address. The contracts all stated that correspondence in connection with the course should be addressed to appellant at its Portland office. Business cards furnished to respondent carried both addresses, as did advertising pamphlets containing information concerning the courses. Each contract of enrollment was sent to the Portland office.

Respondent contends, and the trial court found, that

he was to receive his full commission, either out of the down payment made by the enrolling student, or as soon as the contract was accepted by appellant, not later than the end of the month during which the contract was accepted. He contends that he was informed that a plan had been devised, pursuant to which the contracts would be "financed" or discounted, and his full commission paid.

Respondent was engaged in the solicitation of enrollments for approximately five months, and it is admitted that he obtained thirty-four contracts, all of which were accepted by appellant. Respondent claims a total amount due for commissions in the sum of $614, of which he received $256.30; appellant admitting a further liability in the sum of $16.50, which amount was tendered into court. Judgment was rendered in respondent's favor for the sum of $357.70, being the full amount which he claimed to be due.

Appellant's Seattle branch was closed during the month of July, 1935, at which time appellant's agent, Ray Davis, left its employ. After this time, collections on outstanding contracts were made by appellant through an agent.

Respondent wrote several letters to appellant at Portland, asking about payment of the balance of his commissions, and appellant finally wrote respondent, stating that respondent had never been employed by it, and that respondent should make any claim for compensation to Ray Davis; whereupon respondent instituted this action.

Appellant admits that Ray Davis was its agent, and that respondent was hired by Mr. Davis to solicit enrollments. It also admits that respondent was to receive eighteen dollars for each student which he enrolled, but alleged that his commission was payable, sixty per cent of the down payment, the balance as

the money was received from the students, and that no money was, under any circumstances, due respondent upon money which the student agreed to, but never did, pay. Appellant also contends that it never contracted with respondent, and is not liable to him in any amount, save as tendered into court.

It appears that appellant had placed its contracts for collection in the hands of one Anderson, against whom respondent caused a writ of garnishment to issue. Mr. Anderson testified on the trial to the effect that he had collected on these contracts $480, his accounts showing that he had collected some money upon contracts which respondent had procured.

Respondent contended, as above stated, that he was to have his entire commission by the end of the month during which he procured the enrollment, while appellant contends that the commission was payable as and when the contract payments were collected. Respondent's testimony is not at all satisfactory. As stated by the trial judge, respondent claimed a most unusual and, we think, unreasonable contract. He swore that he was to keep sixty per cent of the down payment, but he admits that he was to turn the remaining forty per cent of this down payment over to appellant, even though the sixty per cent which he retained was less than the total amount of his commission. In other words, according to respondent's story, if he collected thirty dollars as a down payment on a sixty-nine dollar contract, he kept his full eighteen dollar commission and remitted twelve dollars to appellant. If he accepted as small a down payment as five dollars, he kept three dollars and remitted two dollars. If the student at the end of that month made a further payment of five dollars, while appellant would have received only a total of seven dollars, it would then be obligated to pay respondent fifteen dollars, or the

balance of his full commission, and be eight dollars out of pocket if the student made no further payment.

Respondent testified that Mr. Davis and Mr. Riggle, his assistant, told respondent that appellant would make all collections; that they did not have money enough to handle the contracts on a cash basis, but were

". . . negotiating with a man to finance the whole thing. We turn the contracts over to him for about five or ten per cent, so you won't have to worry about that any more even if we are short."

It appears that the deal for financing the contracts was never made, and that certain payments were from time to time made to respondent, which appellant contends bear out its contention that respondent was to receive thirty per cent of the payments subsequently made until he received his full commission.

The trial court found that respondent had procured contracts which, on their face, entitled respondent to receive $614, which finding is undoubtedly correct. The court further found

". . . that notwithstanding any written agreement defendant may have had with one Ray Davis, the same had no application to this plaintiff, and that there is no basis in fact or law to support either the allegations of the defendant's first affirmative defense or of its second affirmative defense. The court does find there was an attempted tender of $16.50 made at the time the defendant answered herein, which however, the court finds is unavailing in this cause."

The trial court, in summing up the case, used the following language:

"It is undisputed here that the defendant expected to finance its contracts, and with such expectation it was perfectly natural and consistent that it should make a contract such as the plaintiff says it made. Two witnesses have testified to this;"

apparently being of the opinion that appellant's representative, Mr. Davis, had made with respondent an absolute contract for the payment of commissions due respondent in accordance with the latter's theory, as testified to at the trial of this action, and that Mr. Davis had apparent authority to bind appellant to such contract.

While it is doubtless true, as testified by respondent, that Mr. Davis told respondent that he expected to discount the contracts, in which event, of course, respondent would be entitled to receive immediately any balance due him, in our opinion the record preponderates against any finding that any agreement was made with respondent to the effect that he would receive the balance of his commission at the end of the month within which he turned in any particular contract. Respondent apparently testified that he was entitled to receive from appellant the full amount of his commission, even though the student paid nothing on the contract save the down payment, and he definitely testified that he was, as above stated, to receive from appellant the entire balance of his commission, even though, at the time he claimed he should receive the same, a considerable portion thereof had to be advanced by appellant out of its own funds.

It would certainly be a most unusual arrangement if a principal would advance its agent his commission, trusting to subsequent collections from the purchaser (in this case the student) to reimburse itself for such advances. According to respondent's story, he could have financially profited by procuring signatures to contracts in which the receipt of five dollars down payment was acknowledged, when in fact none was made, remitting two dollars with the contract to appellant, and at the end of the first month, if appellant mean-

while had not rejected the contract, demanding from appellant fifteen dollars as the balance of his commission.

Respondent testified that he could accept a down payment in any amount he saw fit, even as little as two dollars. He also admitted that appellant never did pay him according to his theory of the contract, but insists that he complained of this and tried to get a written contract, which he never procured. He received statements bearing the names of students whom he had enrolled, which statements tend to substantiate appellant's contention as to the terms of the contract between the parties.

Under date October 3, 1935, respondent wrote appellant's manager a letter, the first portion of which read as follows:

"Just a line to ask if you got my letter last week. I never heard from you. I wish you would please send me a statement and cheque to cover my August commissions and September also."

If respondent was relying upon such an agreement as he claims he had with appellant, as the contract was admittedly terminated during the month of July, it is difficult to understand how he could have claimed any August or September commissions, as the entire amount due him would have been payable July thirty-first. Concerning this letter, respondent testified as follows:

"THE COURT: That is for work that you had done for the old corporation? A. Yes. THE COURT: But you did not work for them in August and September, 1935? A. No; I quit the latter part of July. THE COURT: And why did you ask them for commissions that you had earned in August and September? A. They did not pay. You see, they did not settle until after the— THE COURT: (interposing) You are referring to payments made by students you had so-

licited then? A. No; I was then referring to, actually, that they had not paid me anything for the end of the last month. Q. What month is that? A. That would be August. Q. Well, were you working for them in August? A. No; I was working in July, but they had not given me a statement for July, August, or September. Q. Now then, any student that you enrolled in August under the terms of the deal as you have testified to here, all of your commission would be due to,— or July, if you enrolled the student in July, all the commissions due on that enrollment would be due to you on the end of August; is that not correct? A. Sure, it would. Q. Then what commissions would you have due you in September? A. Well, probably, just an oversight on my part. Q. Is it a fact that you were at that time referring to collections to be made on these accounts that you had enrolled students for and were coming in from month to month; isn't that correct? A. Not necessarily. Q. Well, answer it 'yes' or 'no'. You can. A. I don't think so. Q. Well, what is the purpose of asking for September commissions? A. Well, if you had not received any on any— Q. (interrupting) I asked what is the purpose of asking for September commissions in October of 1935? A. Well, as I said, it is just probably an oversight on my part stating in those months.''

Manifestly, this and other attempted explanations of the letter are unsatisfactory.

Respondent admitted that he knew other agents were working under contracts similar to that which appellant contends respondent had, but contended that a different contract had been made with him. Respondent's testimony is not corroborated, save by one witness, who stated that Mr. Davis had offered him an agency and had told him that a finance plan had been worked out whereby the balance of the entire commission would be paid on the first of the month following the acceptance of the contract. Even the testimony of this witness indicates that the deal to

finance the contracts had not been fully consummated. Respondent admitted that he knew that the plan to finance the contracts had not been embodied in any executed contract.

We are convinced that the terms of the contract made with respondent were as contended by appellant, and that respondent's idea that he would receive the entire balance of his commission at the end of the first month was based upon a contemplated arrangement to finance the contracts, which arrangement was never completed. It must be held, then, that respondent worked under his contract as made, and that he has no right to demand of appellant the full balance of his commissions as he would have received them had the contracts been discounted. We are satisfied that the evidence clearly preponderates against the finding of the trial court in this particular.

Much of the argument is devoted to the question of the real or apparent authority of Mr. Davis to bind appellant. In this connection, we are entirely satisfied that respondent had a valid contract with appellant, and that appellant must account to respondent for his share of the student fees as the same are collected upon the contracts which respondent procured.

Respondent contends that, because of appellant's denial of indebtedness, respondent obtained the privilege of immediately suing for all commissions which he claimed were due to him. We have read the authorities cited by respondent in support of this proposition, and hold that they are inapplicable to the situation here presented. Respondent is entitled to receive commissions only upon moneys actually collected by appellant. We cannot hold that appellant's denial of liability was made in bad faith, the question of appellant's liability to respondent presenting

questions of law which are worthy of serious consideration. On this phase of the case, we hold that respondent neither was nor is entitled to recover more than his commission on the collections which appellant has made.

■ Under our liberal rules concerning amendments to pleadings (Rules of Practice III, §§ 2, 8 and 9, 159 Wash. lviii), this action should not be dismissed, as the evidence indicates that the plaintiff (respondent herein) is probably entitled to recover judgment against the opposing party.

The judgment appealed from is accordingly reversed, with instructions to the trial court to take evidence and to award respondent judgment for his share of the collections on his contracts which the students have paid. Appellant will recover its costs in this court; costs in the superior court to abide the result of the further proceedings herein directed.

BLAKE, TOLMAN, MAIN, MITCHELL, and GERAGHTY, JJ., concur.

HOLCOMB, J. (dissenting)—It is futile to remand the case for retrial, and the reason given for the result reached by the majority is hypertechnical. Under the facts as accepted by the trial judge and the law applicable, the judgment should be affirmed.

I therefore dissent.

MILLARD, C. J., concurs with HOLCOMB, J.

STEINERT, J. (dissenting)—In my opinion, the evidence does not preponderate against the findings of the trial court. I therefore dissent.