[No. 39457.     Department One.     February 20, 1969.]

MARTIN J. POGGI, *Respondent and Cross-appellant,* v. TOOL RESEARCH AND ENGINEERING CORPORATION *et al.,* *Appellants,* JANE DOE POGGI, *Respondent.* *

*Shidler, McBroom & Gates,* by *George W. McBroom,* for appellants.

*Riddell, Williams, Voorhees, Ivie & Bullitt,* by *Donald Voorhees,* for respondent and cross-appellant.

HALE, J.—Martin J. Poggi, a professional mechanical engineer, had an exclusive contract to sell on commission the products of Tool Research and Engineering Corporation within the state of Washington. He says now that he arranged for the sale of several million dollars worth of gas deflector doors to the Boeing Airplane Company and that Tool Research has refused to pay him his earned commis-

*Reported in 451 P.2d 296.

sion. Tool Research says that his contract was terminated before the sales were made and that he has been paid in full all commissions actually earned. We think Mr. Poggi has a good claim.

In 1937, Mr. Poggi received a bachelor's degree in mechanical engineering from the California Institute of Technology. Ever since, he has in one way or another worked in connection with the aeronautical and aerospace industries. At the time of trial, he was a member of the Society of Automotive Engineers and for about 10 years had been a member of the Institute of Aerospace and Aeronautical Sciences. In May, 1958, he signed an agreement with the John J. Foster Manufacturing Company, a predecessor of Tool Research and Engineering Corporation, which provided for commissions at 5 per cent and made him that company's exclusive sales representative in the state of Washington. The contract said that it "shall be considered as being effective for one year . . . and shall at the end of that period automatically renew itself for a like period." Either party, however, could cancel the agreement on 30 days' written notice by registered mail.

Tool Research, among other products, was producing a welded, honeycombed material called Stresskin—a material consisting of a metal honeycomb separating two smooth-surfaced faceplates. Stresskin has great strength for its weight, withstands very high temperatures, and can be readily shaped. Because of these characteristics, Poggi saw several possible applications of it in the aeronautical and aerospace industries.

Mr. Poggi tried to get Boeing to use Stresskin as a re-entry shield for DynoSoar and as a structural support, but the company instead gave him a small order for some to use in a test panel it was building—an order which netted Mr. Poggi only a few hundred dollars in commission. During the course of numerous consultations with Boeing engineers and technologists in 1961, however, when plaintiff first saw a mock-up of the new model 727 tri-jet transport then on display to selected suppliers, he concluded that Stresskin's unique qualities might make it applicable as an

integral part of what is called the thrust reverser door. Each of the three jet engines on the new 727 would have two thrust reverser doors, thus providing a tremendous sales potential in the new Boeing 727 of six doors for each plane.

The thrust reverser assembly is a device mounted on the tailpipe of each jet engine. In flight, the door is closed, and the jet exhaust flows out the back. When the engines are put into reverse thrust to slow the plane on landing, the thrust reverser doors come out from the walls of the tail-pipe and break the flow of the jet exhaust so that it flows out the side and hits the deflector doors forcing the thrust forward at about a 60-degree angle. The forward thrust thus produced by the action of the exhaust against the thrust reverser doors exerts a braking action on the airplane.

Boeing engineers had once told Poggi that the thrust re-verser doors would have to be of brazed honeycomb core because the conventional design, known as skin and stringer, would be too heavy. As an engineer, Poggi knew that the jet exhaust produces a high sound level and creates a very high frequency vibration that will shake the face sheets and cause them to flex until they break. He saw in Stresskin an additional advantage over the other types of brazed doors not only because of its strength and its ability to withstand higher temperatures but also in its greater capability to resist this sonic fatigue.

April 25, 1961, Mr. Poggi wrote Foster Company, prede-cessor to defendant Tool Research and Engineering Corpora-tion, asking to be brought up to date on the possible applica-tion of Stresskin in speed brakes and explaining that there was a possibility that the product could be sold to Boeing for use in the 727. As time went on, Mr. Poggi kept making his recommendation for use of Stresskin in the manufacture of thrust reverser doors and constantly relayed to his com-pany information and advice as to its ever-growing poten-tial use. By September, 1961, he told his company, Foster, that Boeing would be a possible market for 6,000 doors—with an additional market for spares, estimated by Poggi to run between 25 and 50 per cent of the production require-ment.

Poggi participated in a continuous round of discussions with Boeing's engineering and material departments in an effort to discover means and methods of reducing weight, for, as he expressed it, "weight at that time was very important. The airplane was overweight in the aft end and weight was the number one criteria at that stage of the game." During this interim, while plaintiff was trying to sell Boeing on the concept of Stresskin thrust reverser doors, he exchanged mountains of technical, engineering and cost information with the Boeing staff and with his own company. Despite skepticism from Boeing engineers and metallurgists who doubted whether a curved surface could be brazed properly to meet the airplane company's requirements, Poggi convinced Boeing that, by employing a new high nickel matrix brazing alloy, defendant's Stresskin thrust reverser doors would be eminently satisfactory.

By January 9, 1962, defendant company had brazed its first door and would soon produce two more hoping to get one of them shipped to Boeing. After one of the doors had been delivered, the Boeing engineers made changes in its design, and Poggi had to make a referral of new drawings of the proposed doors along with technological explanations to defendant company.

To shorten this narrative of events, we draw upon the court's findings of fact, which, we observe, were in every respect abundantly supported by the evidence. The learned trial court was convinced from the evidence that plaintiff's efforts were indispensable to the subsequent sales of the doors to Boeing and that without his participation there would have been no sale.

After nearly 4 years of negotiations, conferences, studies and persuasion, Boeing, about May 21, 1965, decided to incorporate Stresskin thrust reverser doors into all production model 727 airplanes as rapidly as defendant could produce them. The record shows that Poggi did a fine job for his company. During the interval of December, 1964, and January, 1965, Boeing paid defendant company $142,-500 as a one-half reimbursement for research and development costs, and in part for the purchase price of thrust

reverser doors already delivered. On these transactions, there was no doubt that Poggi had earned his commission and they are not in controversy now.

About December 1, 1964, Boeing placed with defendant a firm order for 500 Stresskin thrust reverser doors for later delivery; the same order was later increased to 610 doors by means of a later Boeing purchase order. Poggi performed what the parties referred to as post-contract services with respect to this order up to August 2, 1965. July 27, 1965, Boeing issued to defendant a new order—on what is described as a letter of intent to purchase—for 960 more Stresskin thrust reverser doors. This letter of intent was followed on November 17, 1965, by a purchase order, and the court found that the letter of intent of July 27, 1965, amounted to a firm order for the purchase by Boeing of the 960 doors. Again, with respect to this latter order, plaintiff performed all post-contract services up to but not after August 2, 1965.

It is these two orders, the first for 610 doors and the second for 960, which are in issue here. Tool Research and Engineering contends that Mr. Poggi did not earn a commission on these orders; that his services with the defendant company had been terminated before the orders had been secured and placed; and that he did not and could not have performed the post-contract services contemplated by his representative agreement with respect to either order.

An understanding of the relative rights and responsibilities between plaintiff and defendant concerning the sales and commissions arising from the two Boeing orders requires specific reference to what the parties call the representative agreement. Signed by the parties and effective as of May 15, 1958, this agreement appointed Mr. Poggi as exclusive sales representative for the John J. Foster Manufacturing Company—predecessor to defendant Tool Research and Engineering Corporation—in the sales territory of Washington state. Tool Research later succeeded to all of Foster Manufacturing Company's rights, duties and privileges in this contract. In the sales representative agreement, defendant promised to pay Poggi,

so far as pertinent here, a 5 per cent "commission on all remittances received for all formal orders from customers located within the sales territory assigned. herein."

The agreement also provided that commissions on "remittances received from customers up to the end of each month will be made on or before the 15th day of the following month" and stated that Mr. Poggi, the sales representative, would pay all of his own expenses in performing his side of the contract. A crucial provision of the agreement fixed its term at 1 year, but allowed either party to terminate it on 30 days' notice, as follows:

This agreement shall be considered as being effective for one year from effective date hereof and shall at the end of that period automatically renew itself for a like period. This agreement is subject to cancellation by either party upon thirty (30) days notice in writing by registered mail to the other party.

During a period prior to delivery of Boeing's informal order of November 5, 1964, for the 610 doors, both parties to this action had become aware of the possibility of a tremendous increase in business, a potential running into the millions of dollars, through follow-on orders which might be placed by Boeing for Stresskin thrust reverser doors. Poggi and Tool Research also knew that, because inordinately high commission earnings elevated the costs on follow-on orders, plaintiff would, under the representative agreement, be receiving excessive commissions, and that the aircraft industry had a policy of preventing any sales representative from deriving more than $25,000 to $30,000 annually. Accordingly, plaintiff agreed to a modification of the agreement providing for a reduced rate of commission in the future. From November, 1964, to August 5, 1965, according to the court's finding, the parties negotiated in good faith with each other to modify the agreement and lower the commission rate. During these negotiations, however, on June 14, 1965, Tool Research formally notified Mr. Poggi of its election to terminate the contract under the 30-day termination clause, amending this notice later to make it effective as of July 19, 1965.

While the parties were thus negotiating a modification of the sales representative agreement, Boeing, as the court expressed it in a finding, in order to put defendant into a long-lead position in ordering raw materials for a follow-on order, issued a letter July 27, 1965, declaring its intention to order 960 additional units. Although stating an intention to purchase, this letter did not, under existing procedures, amount to a final agreement to purchase, and terms such as price and design responsibility were to be left to future negotiations. Formal purchase orders concerning these 960 additional units were issued under earlier established ordering procedures by Boeing October 28, 1965. Price per unit was not finally determined until the purchase order had been delivered to defendant, subsequent to plaintiff's termination.

Up to July 19, 1965, as earlier observed, plaintiff and defendant discussed and negotiated a new representative agreement with the idea in mind of a reduced commission based on a rising spiral of anticipated orders. On July 19, 1965, the notice of termination became effective, but the parties continued their negotiations until August 2, 1965, when Poggi informed Tool Research he would no longer represent defendant without a written contract.

The court found that defendant had paid plaintiff all of the commission on all remittances received by the defendant from Boeing prior to July 19, 1965, the effective date of notice that the representative agreement had been terminated, but also found as a fact that Poggi continued his efforts on behalf of defendant until August 2, 1965.

Despite the innumerable side issues developed by the evidence, the salient and determinative facts as found by the court from substantial evidence concern whether the order for the 610 Stresskin thrust reverser doors and the subsequent 960 door order were procured by and attributable to the services of plaintiff prior to the effective termination of his contract. On this pivotal point, the court peered through the layers of orders, instructions and communications among the parties and found that Boeing

placed a firm order with defendant for 500 Stresskin thrust reverser doors on or about December 1, 1964; followed this with a numbered purchase order February 22, 1965; and later increased the amount to 610 doors by numbered purchase orders.

As to the 960 door order, the court found that Boeing issued to defendant a letter of intent to purchase on July 27, 1965, and followed this with a formal purchase order about November 17, 1965, and that both Boeing and defendant understood the letter of intent of July 27, 1965, to be a firm order for the purchase of 960 Stresskin thrust reverser doors. The trial court expressly found that, as to both the 610 door order and the 960 door order, plaintiff was an efficient procuring cause of each order and entitled to a commission upon each order.

Basing its conclusions in large part on these findings, the learned trial judge concluded that, had there been no termination of the representative agreement intervening between the placing of the firm orders, plaintiff would have earned and would have been entitled to a commission of $91,815.15. The court also concluded, however, that since some of the services plaintiff ordinarily would have performed, were not performed because of the termination on August 2, 1965, plaintiff should recover only upon a quantum meruit basis—a basis fixed by the court at 55 per cent of the contractually stated commission. Thereupon the court gave plaintiff judgment at 55 per cent in the sum of $50,498.33. Defendant Tool Research appeals the judgment of $50,498.33, and plaintiff cross-appeals the reduction of 45 per cent, claiming that there is no evidence to support the reduction.

The court's findings, we think, show that plaintiff, according to the sales representative agreement, had fully earned his commission on both the 610 door order and the 960 door order and support a judgment for the full commission. Contrarily, the findings, in our opinion, do not support a conclusion of quantum meruit and the judgment should not have been reduced accordingly.

Defendant contends mainly that, since neither the 610 door order and the 960 door order were received in final form nor remittances in payment thereof were received from Boeing until after termination of the contract on August 2, 1965, there is no legal basis whatever under the representative agreement for liability to pay a commission on the two orders. The contract, defendant argues, provided plaintiff no protection whatever in case of termination other than requiring that notice of termination be given him. Defendant cites *Murray v. Horton*, 51 Wn.2d 484, 319 P.2d 547 (1957), for the proposition that the parties by their own conduct gave this interpretation to their contract and acted on the theory that the contract and all liability ended upon its expiration in accordance with the notice of termination, and that this interpretation is binding upon the courts.

As defendant points out, the interpretation put upon an ambiguous or doubtful contract by the parties through their conduct or own interpretation of it is entitled to great, if not controlling, weight. *Fancher v. Landreth*, 51 Wn.2d 297, 317 P.2d 1066 (1957); *Kennedy v. Weyerhaeuser Timber Co.*, 54 Wn.2d 766, 344 P.2d 1025 (1959); *Topliff v. Topliff*, 122 U.S. 121, 30 L. Ed. 1110, 7 Sup. Ct. 1057 (1887). And the courts, under the guise of construing or interpreting a contract, should not make another or different contract for the parties. *Chelan Orchards v. Olive*, 134 Wash. 324, 235 Pac. 805 (1925); *Mackey v. United Civil Serv. Training Bureaus*, 188 Wash. 186, 61 P.2d 1311 (1936). But the principles set forth in these cases, we think, are inapplicable to the facts as found by the court from substantial evidence, even though in many respects the evidence was sharply conflicting for the court did not hold that the conduct of the parties amounted to an interpretation of the agreement.

The representative agreement, in our opinion, was not ambiguous, and its meaning, therefore, should be ascertained from its language and not from parol evidence concerning it. *Boeing Airplane Co. v. Firemen's Fund Indem.*

Co., 44 Wn.2d 488, 268 P.2d 654, 45 A.L.R.2d 984 (1954). By the express terms of the contract, plaintiff was to receive a commission on all remittances paid by a customer on all orders from within the state of Washington; the contract did not specify that the remittances need be received prior to termination. On this point, the contract stated:

> In consideration of the services rendered and to be rendered by the representative for and on behalf of the manufacturer as herein provided, the manufacturer agrees to pay in full payment for said services, a commission on all remittances received for all formal orders from customers located within the sales territory assigned herein . . . .

The key to applying the contractual provision in this case is the court's finding—amply supported by the evidence—that plaintiff was the efficient procuring cause for both the 610 door order and the later 960 door order, and that he had thereby earned a commission on these orders as stipulated in the written representative agreement.

■ If, as the court found, plaintiff was the efficient procuring cause of the sales, his rights to a commission under the sales representative agreement were governed by the principles earlier laid down in this jurisdiction. In *Hamilton v. C. L. Best Gas Traction Co.*, 123 Wash. 488, 212 Pac. 1077 (1923), plaintiff had an agreement to sell tractors for defendant on commission. For several months, he solicited the Potlatch Lumber Company to buy two tractors. About the time when plaintiff's negotiations were completed, his employers, without his knowledge, directly contacted the prospective buyers concerning the sale and a few days thereafter cancelled the agreement with plaintiff and terminated his employment. About 2 weeks later, defendant sold two tractors to the prospective customer, Potlatch Lumber Company. In overruling a dismissal sustaining a demurrer and upholding the salesman's right to maintain an action for commissions on the two tractors, even though at the time the sale had been consummated and delivery

made plaintiff was not an employee of defendant, this court said, at 496:

> If the allegations of plaintiff's complaint are true, he must now be regarded as the efficient, procuring cause of that sale before the termination of the agreement by the notice given to him by defendant. . . . Under the facts as alleged, we think the defendant is in no position to here contend that plaintiff was not its agent for the purpose of procuring that sale, or that plaintiff did not become the efficient, procuring cause of that sale, or that plaintiff is precluded from rightfully claiming compensation, which, for want of a better term, may be called commission upon that sale . . . .

Again, in *Zelensky v. Viking Equip. Co.*, 70 Wn.2d 78, 422 P.2d 293 (1966), Viking Equipment, as exclusive distributor for Simonsen Radio, had tried to sell to the United States Bureau of Fisheries an electronic device to be used by the bureau on one of its research vessels. After negotiating with the bureau and trying to ascertain its standards and requirements, Viking tried to get a firm bid price from Simonsen so that Viking could submit a bid to the Bureau of Fisheries. Instead of supplying Viking with this information, Simonsen procured the bid forms, submitted the bid directly, and was awarded the contract. In sustaining Viking's right to the commission, this court said, at 83:

> We hold that, although Simonsen had the right to terminate the distributorship at will, and apparently did so in February of 1963, that as to the government sale then pending, it could not terminate Viking's right to compensation if Viking was the procuring cause of the sale. On the record before us, viewing the evidence and reasonable inferences therefrom in the light most favorable to Viking, we believe that this was a question for the jury.

Although either party had a right under the sales representative agreement to effectively terminate the agency on notice, the termination could not rightfully operate to cut off the agent's rights to commissions already earned. As the procuring efficient cause of the two orders, the agent here earned his commission under the contract which accorded him a commission on all remittances received for

all formal orders. Nothing in the contract excluded or cut off his rights to a commission on orders procured by him but paid for after termination. Plaintiff performed the work, produced the desired results, and earned his pay.

■ One final comment concerning the 45 per cent reduction of the contracted for amounts. We have been unable to find a tenable basis in the evidence upon which the learned trial judge reached this figure or decided to reduce the commission. Our surmise is that the court, hoping to achieve some sort of equitable solution, took into consideration that, after the orders had been obtained through plaintiff's services, he had not performed what the parties, but not the contract, described as post-contract services—such services as would ordinarily be expected of him had he not been terminated until the remittances were received for the two orders.[1] The court found that, after termination of the sales agreement, other employees of defendant performed these post-contract or post-order services. The record does not disclose, however, the value of such services, or whether defendant ever requested plaintiff to perform them with reference to the two orders, or indeed would permit him to do so after it had notified him that he no longer represented them. Nor was there any finding that the defendant actually suffered any loss in having other employees perform these services.

Having proved that he was the procuring and efficient cause of the orders, plaintiff established his damages with reasonable certainty and upon substantial evidence for breach of a written agreement. Defendant failed to establish with reasonable certainty any basis either for limiting recovery to a quantum meruit, or any offset or cross claim and none, we think, should therefore have been allowed.

---

[1]Finding of Fact No. 19:

"If plaintiff had performed all the post-contract services which he would have been called upon to perform had he not been terminated, he would be entitled to his full contractual commissions in the total sum of $91,815.15 . . . ."

Accordingly, the judgment will be modified to restore to plaintiff the 45 per cent deducted from his commission. In all other respects, it is affirmed.

FINLEY, WEAVER, and ROSELLINI, JJ., and RYAN, J. Pro Tem., concur.

May 15, 1969. Petition for rehearing denied.