JOHN RENSHAW, PLAINTIFF-APPELLANT, v. UNITED STATES PIPE AND FOUNDRY COMPANY, A NEW JER-SEY CORPORATION, DEFENDANT-RESPONDENT.

Argued March 3, 1959—Reargued May 4, 1959—
Decided July 31, 1959.

*Mr. Henry J. Bender, Jr.,* argued the cause for plaintiff-appellant.

*Mr. George H. Bohlinger, Jr.,* argued the cause for defendant-respondent (*Messrs. Minton, Dinsmore and Bohlinger,* attorneys; *Mr. Bohlinger,* of counsel).

The opinion of the court was delivered by

HALL, J.    This appeal involves a claim by plaintiff, a retired employee of defendant, that a provision of the latter's private pension plan reducing the amount of the pension payable to the extent of any benefits under the Workmen's Compensation Law received by the pensioner after retirement is invalid as against public policy.    The case was tried in the Burlington County Court, Law Division, without a jury on a stipulation of facts.    Defendant had judgment there and plaintiff appealed to the Appellate Division.    We certified the case on our own motion while it was pending in that tribunal.    *R. R.* 1:10–1(*a*).

On March 1, 1955 plaintiff, who had then been employed by defendant at its Burlington plant for about 19 years, injured his left leg at work in a compensable accident.    Thereafter he filed a claim petition for benefits under the Workmen's Compensation Act.    On April 1, 1955 he was retired from employment pursuant to the company's pension plan, having attained the age of 65.    The accident had no connection with his retirement.

The pension plan derived from a collective bargaining labor agreement between defendant and the United Steel-

workers of America, the exclusive bargaining agent of defendant's production and maintenance employees who were associated as a local unit of the union. The plan was originally agreed to March 1, 1950. It was revised as set forth in a formal agreement executed by the local union and defendant effective March 1, 1955, to expire concurrently with the basic labor agreement between the company and the union. We are concerned on this appeal with certain provisions of this latter instrument. We are given to understand that it was, at its effective date, standard throughout the steel industry.

The contract provided that any employee retiring on or after the effective date with at least 15 years of continuous service and having attained the age of 65 should be entitled to receive a pension. It also provided for a pension for disability for any employee with the same period of continuous service who had not reached the age of 65 but who had become "through some unavoidable cause permanently incapacitated." Retirement was made compulsory in any event at age 65.

Specified in the agreement was a formula on which the amount of the pension was to be determined in each case. Generally speaking, it was to be on a monthly basis computed on a percentage of the average monthly earnings of the employee over a designated period before retirement. It was non-contributory as far as the employee was concerned, all moneys being provided by the company. The latter was required to arrange for funding of all matured pensions on a sound actuarial basis, by establishment of a trust fund or insurance or both, in order to secure the payment of pensions during the remainder of the life of retiring employees. The plan was to be administered solely by the employer, and it was specifically prescribed that no employee prior to eligibility for benefits would have any right or interest in or to any portion of any funds paid into any trust or annuity that might be established to pay pensions.

It was further provided that the amount of an individual pension payable according to the formula was subject to reduction or adjustment under certain conditions, which fell into three categories:

1. The amount of the pension for any period was to be reduced by the amount of any other pension, annuity or similar payment to which the pensioner was entitled, whether applied for or not, from any public source (with the exception of pensions granted for military service or payments under the state law pursuant to Title I of the Social Security Act, 42 *U. S. C. A.* § 301 *et seq.*), or from any other source to which the company had contributed. If the pensioner had also contributed to the fund out of which an "other source" pension was payable, the reduction was to be decreased based on the ratio his contributions bore thereto. It was also specified that the reduction by reason of primary old age insurance benefits provided by Title II of the Social Security Act, 42 *U. S. C. A.* § 401 *et seq.* should be limited to $85 per month.

2. If the pensioner was or should become entitled to or be paid "any discharge, liquidation or dismissal or severance allowance or payment of similar kind" under any plan of the company, or as to which it had contributed, or by reason of any statute, the total amount so paid or payable was to be deducted from the amount of any pension under the agreement, with similar adjustment for any employee contribution thereto.

3. The permitted deduction directly involved and attacked in this case, reading as follows:

"Any amount paid to or on behalf of any Employee or Pensioner on account of injury or occupational disease causing disability in the nature of a permanent disability for which the Company is liable, whether pursuant to Workmen's Compensation or occupational disease laws; or arising otherwise from the statutory or common law (except fixed statutory payments for the loss of any bodily member), and any such payments on account of employment by an employer other than the Company, and any disability pay-

ment in the nature of a pension under any federal or state law, shall be deducted from or charged against the amount of any pension payable under this Agreement, provided, however, there shall not be deducted from any pension benefits payable prior to age sixty-five (65) because of eligibility arising under Paragraph (b), of Section II [pension for disability prior to age 65] any payments which shall be received by the Pensioner under Workmen's Compensation or Occupational Disease laws for any disability in the nature of a permanent disability."

Defendant paid plaintiff his full monthly pension computed according to the basic formula in the agreement from his retirement on April 1, 1955 until November 30, 1955. On September 30 of that year a determination, award and rule for judgment on plaintiff's claim was entered in the Division of Workmen's Compensation by which he was awarded temporary and permanent disability compensation and other benefits as a result of the compensable accident. The judgment provided that the employer should be given credit thereon for all payments made to plaintiff under its pension plan from April 1, 1955. Presumably this direction was made pursuant to the plan provision just quoted. After November 30 defendant ceased to pay plaintiff any pension. The compensation award was fully paid, the last payment thereon being received about June 19, 1956. Defendant took the position that, pursuant to the plan, it was not required to resume payment of the pension until January 1, 1961 by which date the total of monthly pension, computed from April 1, 1955, would equal the disability compensation awarded and payable after the latter date. It is conceded that such is the correct result if the plan provision is valid and effective.

After the last compensation payment was received, plaintiff instituted the present action in which he demanded by way of money damages the amount of the pension for each month since defendant had stopped making payment thereof and sought a declaratory judgment that the quoted provision of the pension agreement was unenforceable as violative of the public policy of the State and that he was entitled to

receive his full monthly pension from the date of his retirement for the rest of his life without deduction or charge by reason of the compensation award. Defendant's answer asserted the validity of the pension plan provision in question and its binding effect on plaintiff. It also set up the separate defenses of *res adjudicata* and estoppel (which require no discussion in the view we take of the case). The trial court held that the plan provision was valid and entered judgment for defendant.

Plaintiff's contention is that, considering the nature, intent and incidents of workmen's compensation, the provision in the retirement plan for reduction of pension by the amount of compensation benefits is contrary to the basic purposes of the compensation act and the character of an award thereunder. It is said this is particularly so because it in effect permits the employer to recoup the amount paid the employee for compensation contrary to the only method allowed therefor by the statute.

Workmen's compensation indeed serves a social purpose recognized by the Legislature and so unquestionably is deeply involved in public policy. While in the United States it is not outright public social insurance, "the ultimate function it performs as one unit in a developing over-all system of insurance-type protection against wage loss is the same as if it were true social insurance." 2 *Larson, The Law of Workmen's Compensation* (1952), § 96.10, *p.* 483. Other units in the developing system are legislatively provided benefits for non-occupational disability, unemployment compensation, retirement and disability pensions for public employees, and old age insurance and assistance under the social security system, as well as severance or dismissal pay and pension and insurance benefits provided by employers unilaterally or by collective agreement. (We do not speak, of course, of insurance benefits or other protection privately arranged and paid for by the employee with which an employer has no connection.) Our courts have commented that the social purposes which inspired workmen's com-

pensation and, for example, unemployment compensation, are identical. *Felice v. Felice*, 34 *N. J. Super.* 388, 392 (*App. Div.* 1955).

██ It has been frequently and appropriately said that the basic purpose of workmen's compensation is "to shoulder on industry the expense incident to the hazards of industry; to lift from the public the burden to support those incapacitated by industry and to ultimately pass on to the consumers of the products of industry such expense." *Morris v. Hermann Forwarding Co.*, 18 *N. J.* 195, 197–198 (1955). The New Jersey theory is that liability or its extent is not based on the impairment or loss of earning power, but rather the loss ensuing from personal injury as it detracts from the former efficiency of the workman's body or its members in the ordinary pursuits of life. *Everhart v. Newark Cleaning & Dyeing Co.*, 119 *N. J. L.* 108, 111 (*E. & A.* 1937).

█ In the light of this concept and in support of the public policy evidenced thereby, safeguards have been thrown around the benefits of the law, both for protection of the injured employee and to thwart efforts of the employer to avoid the financial effect of or to secure reimbursement of his obligation. For example, claims or payments due are not assignable and are exempt from all claims of creditors, levy, execution or attachment (*R. S.* 34:15–29). The employer or his insurance carrier may not secure reimbursement or offset of compensation paid except out of the proceeds of an action brought by the employee or his dependents against a third party liable for the injury or death (*R. S.* 34:15–40, as amended; *United States Casualty Co. v. Hercules Powder Co.*, 4 *N. J.* 157 (1950); *Williams v. Department of Public Welfare, City of Newark*, 43 *N. J. Super.* 473 (*Cty. Ct.* 1957)). Nor may an employer secure credit beyond the compensation rate for payments made by way of wages or gratuitously during a period when the employee is entitled to benefits under the act even when the latter agreed to such additional credit. *Blackford v. Green*, 87 *N.*

*J. L.* 359 (*Sup. Ct.* 1915), affirmed on opinion below, 89 *N. J. L.* 357 (*E. & A.* 1916); *cf. Beach Construction Co. v. Sullivan,* 13 *N. J. Misc.* 582 (*Sup. Ct.* 1935).

Had, then, defendant sought to reduce the compensation payments by the amount of the pension, which was unrelated to the disability resulting from the accident, it may be, although we need not decide the point, that such would violate the public policy underlying our compensation act as interpreted by the rationale of the cases cited. The authorities in other jurisdictions appear to be divided on the point where the pension or other payment is not legislative in origin. The differing results seem to depend on intent derived from the language of a particular statute. 58 *Am. Jur., Workmen's Compensation,* § 306, *p.* 792; *Annotation: "Right to compensation under workmen's compensation act as affected by pension, insurance, gratuities or other benefits not derived from the act itself,* 119 *A. L. R.* 920 (1939). A similar question has frequently arisen where the pension is a public one to which the injured employee is statutorily entitled by reason of the very injury for which compensation is sought. In such cases New Jersey has held the employee shall not receive compensation, amounting to duplicate public benefits, on the basis of legislative intent gleaned from the appropriate enactments. *Pirher v. Board of Public Works of South River,* 37 *N. J. Super.* 482 (*App. Div.* 1955); *Flynn v. City of Union City,* 32 *N. J. Super.* 518 (*App. Div.* 1954). Compare the opposite result reached that the statutes do not indicate the intention to bar dependents of a deceased employee (as distinct from the employee himself), killed at work, from compensation death benefits because a public pension is also available to the dependents. *Eckert v. New Jersey State Highway Department,* 1 *N. J.* 474 (1949); *Gulh v. Township of North Bergen,* 35 *N. J. Super.* 24 (*App. Div.* 1955). It may be noted that, conversely, there is a division of view in other states whether acceptance of compensation benefits bars the right to a pension to which a public employee is made

eligible legislatively by reason of the same accidental occurrence. 40 *Am. Jur., Pensions,* § 27, *p.* 984.

But in our case it is plain beyond argument that no decrease in compensation benefits was intended or accomplished by the pension plan, nor did it amount to an unlawful means whereby defendant was enabled to recoup such payments. (It was self-insured for compensation purposes, but that fact is of no significance one way or the other.) The purpose and design of the agreement were quite differently oriented. The difference is not a mere play on words; the distinction is one of fundamental principle. What the plan actually amounted to, and no more, was a commitment by the company to see that each retired employee received a fixed amount of money monthly, to compensate partially for wages lost through inability to continue employment by reason of age, and that if such was not forthcoming in whole or in part from the specified sources, *i. e.,* public pension, other pension contributed to by the company, social security benefits, private or statutory severance pay and the like, workmen's compensation benefits from the company or any other employer or public disability pension, it would pay the computed amount or any deficiency. The scheme had no particular relation to compensation benefits. Its scope was much broader and the theory an infinitely deeper one.

■ Moreover, it was no unilateral or gratuitous undertaking, but an agreement collectively bargained for and reached between the employer and the exclusive agent of the employees as part of a basic labor contract. We assume, of course, the enforceable nature of the understanding. See 40 *Am. Jur., Pensions,* § 21, *p.* 978. In such a situation, the rights and obligations of the parties must be measured by the terms of the contract under the ordinary rules of contractual construction. *Annotation, "Rights and liabilities as between employer and employee with respect to general pension or retirement plans,"* 42 *A. L. R.* 2d 461, 472 (1955).

■ We see no public policy question involved, and so no violation thereof, in any such design of a private, contractual pension plan or the particular provision before us. Plaintiff's position would seem to be equally assertive against decrease in the pension by the amount of social security payments or any of the other specified deductions. We find nothing to warrant concluding that workmen's compensation payments should be in any different or more insulated category. That such payments are not completely untouchable is evidenced by the result reached in *Pirher* and *Flynn*.

While it has been suggested in other connotations that pensions amount to recompense for past services (*Salz v. State House Commission*, 18 *N. J.* 106, 112 (1955); *Dolan v. Heller Brothers Co.*, 30 *N. J. Super.* 440, 444 (*Ch. Div.* 1954)), a private employer is not compelled to pay or provide for them and if he chooses to do so, may pay thereby as much or as little and on such terms and conditions as he chooses or as may be agreed to where the subject is part of a collective bargaining agreement. Our Legislature has not expressed any public policy in the matter and there is no reason for the judiciary to interfere with the agreement these parties reached. Consequently, we see nothing invalid in the provision of the plan providing for the reduction of pension payments by the amount of workmen's compensation benefits received after retirement.

The contracting parties here appear to have followed an approach suggested by a recent expression of a philosophy concerning the relationship between modern wage-loss remedies. Larson suggests (*ibid.*, § 97.10), in speaking of the various kinds of public benefits, that as a matter of soundness there should be appropriate coordination between them, now generally missing or unclear, to avoid duplication of payments for the same real loss. He comments:

"Wage-loss legislation is designed to restore to the worker a portion, such as one-half to two-thirds, of wages lost due to the three major causes of wage-loss: physical disability, economic un-

employment, and old age. The crucial operative fact is that of wage-loss; the cause of the wage loss merely dictates the category of the legislation applicable. Now if a workman undergoes a period of wage loss due to all three conditions, it does not follow that he should receive three sets of benefits simultaneously and thereby recover more than his actual wage. He is experiencing only one wage loss and, in any logical system, should receive only one wage-loss benefit. This conclusion is inevitable, once it is recognized that workmen's compensation, unemployment compensation, non-occupational sickness and disability insurance, and old age and survivors' insurance are all parts of a system based upon a common principle. If this is denied, then all coordination becomes impossible and social legislation becomes a grab-bag of assorted unrelated benefits." (*Vol. 2, p.* 489.)

Such coordination has been judicially declared to some extent in New Jersey, mainly through judicial interpretation of legislation, not only in the public pension-workmen's compensation instances previously mentioned, but also in the situation involving benefits under the temporary non-occupational disability benefits law versus those under the compensation act (*Janovsky v. American Motorists Insurance Co.,* 11 *N. J.* 1 (1952)). Compare, however, the right to unemployment compensation under the particular provisions of our statute after mandatory age retirement and receipt of pension pursuant to a collective bargaining agreement (compensation allowed, *Campbell Soup Co. v. Board of Review,* 13 *N. J.* 431 (1953); *cf. Krauss v. A. & M. Karagheusian, Inc.,* 13 *N. J.* 447, 464 (1953)). The learned text writer (§ 97.33) inferentially agrees with the idea of a court construing a private pension plan, not express or specific as is the instant one, to preclude retirement benefits while workmen's compensation payments are being received, again to avoid duplicate payments for what he considers to be the same basic loss.

The judgment is affirmed, but without costs.

*For affirmance*—Chief Justice WEINTRAUB, and Justices BURLING, JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO —7.

*For reversal*—None.