[No. 39667. Department One. March 6, 1969.]

WILLIAM F. DORWARD, *Respondent,* v. ILWU-PMA PENSION PLAN, *Appellants.**

*Reported in 452 P.2d 258.

*Bogle, Gates, Dobrin, Wakefield & Long* and *Dustin C. McCreary,* for appellants.

*Schroeter & Jackson* and *Paul D. Jackson,* for respondent.

ARMSTRONG, J.†—This appeal arises from a contract action commenced by the plaintiff (respondent), William F. Dorward, a longshoreman, to collect pension payments from a joint labor management trust, created under various collective bargaining agreements between employer associations in California, Oregon, and Washington and labor unions representing men employed in those states in the longshoring industry. The defendants (appellants), the ILWU-PMA Pension Plan and its trustees, appeal from the trial court's determination that the plaintiff was entitled to a pension based upon 25 years of employment as a longshoreman under the defendants' plan.

The plaintiff began his employment in the longshore industry in the Port of New York in May, 1936, where he affiliated with Local 976 of the International Longshoremen's Association (hereinafter called the ILA). He became a "checker" in December, 1936, and continued his employment and union membership in New York until 1948 when he transferred to ILA Local 38-36 in Seattle and began work as a "checker" in the Port of Seattle. The plaintiff remained employed in the Port of Seattle until his retirement on June 1, 1963 at the age of 65. At that time, he was affiliated with ILWU Local 52, which had been chartered as the Checkers Association in 1956.

†Judge Armstrong is serving as a judge pro tempore of the Supreme Court pursuant to Art. 4, § 2(a) (amendment 38), state constitution.

Prior to 1949, there were no pension programs in either the Northwest ports or in the Port of New York covering men employed in the longshore industry other than social security benefits. However, as a result of collective bargaining agreements executed in 1949, the unions and the employers negotiated pension plans which went into operation in 1951. These plans were designed to cover longshoremen employed in California, Oregon and Washington who met the qualifying requirements of the plans. .

ILA District 38, representing certain local unions in the state of Washington, entered into its pension agreement on September 1, 1951 with a group of employers operating in this state and associated together as the Waterfront Employers of Washington (hereinafter called the WEW). In July, 1951, the International Longshoremen's and Warehousemen's Union (hereinafter called the ILWU) and the Pacific Maritime Association (hereinafter called the PMA), an employers' association, entered into a separate pension agreement covering employees they represented. The latter plan was reduced to a formal set of documents in December, 1951. Both the ILWU-PMA plan and the ILA-WEW plan were financed by employer contributions. The terms of the ILA-WEW plan covered longshoremen who had 15 or more qualifying years of employment on January 1, 1951 and had 25 years of service at the time of retirement. It was agreed that under no interpretation of the ILA-WEW plan did the plaintiff have 15 qualifying years of employment as of the January date.

In 1954, the Joint Union Welfare and Pension Committee of the Northwest replaced ILA District 38 as the union party to the ILA-WEW pension agreement. Also, in 1954, the plaintiff ceased to be represented by ILA Local 38-36 as an independent union replaced it. This labor body was subsequently chartered in 1956 as the Checkers Association, ILWU Local 52.

In 1955, the name of the ILA-WEW plan was changed to the "Northwest Waterfront Pension Plan" (hereinafter called the Northwest Plan). This plan was later liberalized and the changes were incorporated in the First Amended

Northwest Waterfront Pension Agreement executed on March 25, 1957. Thereafter, tentative agreement was reached on merging the Northwest Plan with the preexisting ILWU-PMA pension plan. In order to facilitate the merger, the Northwest Plan was further amended on January 6, 1958 in a document entitled: Second Amended Northwest Waterfront Pension Agreement. An agreement of merger was entered into on February 1, 1958.

Section 5(a)(iii) [See footnote 1] of the merger agreement stipulated that the trustees of the Northwest Plan would prepare schedules, containing the number of qualifying years of service of every covered employee under the Northwest Plan accumulated prior to January 1, 1958, and certify them to the trustees of the ILWU-PMA pension plan. Another provision of the merger instrument, 3(f), stated in part:

Trustees of the continuing plan [the ILWU-PMA Plan with the Northwest Plan merged into it] are authorized to accept as conclusive the facts certified to them by the Trustees of the Northwest plan in the schedules provided for in 5(a) . . . .

Pursuant to these provisions, the Northwest Plan's trustees prepared a preliminary schedule in February, 1958 showing the plaintiff with an initial employment date of May, 1936 and sent it to the ILWU-PMA trustees to aid them in ascertaining whether they wanted to enter into the merger agreement. On December 1, 1958, the ILWU-PMA trustees and the trustees of the Northwest Plan formally completed and executed the merger agreement.

On or about December 10, 1958, after the merger agreement was formalized, the Northwest Plan's trustees prepared and executed the final schedule called for in the merger agreement, listing the qualifying years of the various members of the ILA District locals and independent Washington locals involved and transmitted it to the ILWU-PMA trustees. This schedule showed the plaintiff with 22 qualifying years of service and placed his employment date in the longshore industry as of May, 1936. At all times the

plaintiff's work records were available to the local union, the WEW, and the Northwest Plan's trustees. These records clearly indicated an initial employment date of May, 1936, and gave the place of said employment as the Port of New York.

In March, 1963, the plaintiff applied in writing for retirement under the ILWU-PMA Pension Plan. The plan administrator, Henry Schmidt, took the position that the plaintiff had only 15 qualifying years of service and that he was entitled only to a reduced or pro rata pension. The basis for their refusal of a full 25 year pension was that the ILWU-PMA plan provided coverage only for longshoremen employed under West Coast bargaining agreements. The local union supported the plaintiff's application, contending that the plaintiff's years of employment on the East Coast should be counted in arriving at the total number of qualifying years under the ILWU-PMA Pension Plan and that he should be awarded a full pension based upon 25 years of service.

In *Bakenhus v. Seattle*, 48 Wn.2d 695, 296 P.2d 536 (1956), we stated at 698:

> In this state, a pension granted to a public employee is not a gratuity but is deferred compensation for services rendered. The contractual nature of the obligation to pay a pension when the employee has fulfilled all of the prescribed conditions was recognized in *Luellen v. Aberdeen*, 20 Wn. (2d) 594, 148 P. (2d) 849 (1944), in *Benedict v. Board of Police Pension Fund Com'rs*, 35 Wn. (2d) 465, 214 P. (2d) 171, 27 A. L. R. (2d) 992 (1950), and in *Ayers v. Tacoma*, 6 Wn. (2d) 545, 108 P. (2d) 348 (1940).

Inherent in a determination of the present controversy is the resolution of the following question: Should the *Bakenhus* rule, covering pension plans applicable to public employees, be extended to cover pension plans benefiting individual labor union members, which are negotiated through collective bargaining agreements reached by labor and management units? We think the answer is in the affirmative.

In this jurisdiction, we do not subscribe to any distinction between the rights of public employees under

pension plans granted by public authorities, and the rights of individual labor union members to pension plan benefits acquired by means of collective bargaining agreements. Neither pension is a gratuity, but rather is deferred compensation for services rendered. In analyzing the nature of collective bargaining agreements, judicial notice may be taken of the fact that pension plan rights acquired under said agreements are generally obtained at the cost of possible wage increases and other negotiated benefits. In negotiating collective bargaining agreements there is "give and take" on behalf of both labor and management, and pension rights become irrevocably merged with wage increases in the finished product of the collective bargaining agreement. Both parties profit by the pension plan and both, in effect, contribute. The worker loses job mobility and possible wage increases, but gains pension rights. The employer gains employment stability because he can attract more competent employees and avoids labor turnovers.

■ As a result of collective bargaining, pension contracts are executed by labor unions representing their members, and employer associations bargaining for individual employers. The consideration rendered for the promise in the pension contract of the employer to pay a pension is established when the employee is shown to have knowledge of the pension plan and continues his employment. An enforceable contract will arise in such instances even though the pensioner does not know the precise terms of the pension agreement. *See Hunter v. Sparling,* 87 Cal. App. 2d 711, 197 P.2d 807 (1948). It is clear that in the present case the plaintiff was aware of the pension plan and he did continue his employment until the age of 65.

■ Although an employee does not earn a pension until he has complied with the prescribed years of service, he acquires a vested right in the plan as soon as he performs services in the job category covered under the collective bargaining agreement granting the pension when said pension is in effect. In so analyzing the question before us, we subscribe to the view that the workman acquires a vested right to pension benefits upon being employed in a job cate-

gory covered by an existing pension plan. Where, as here, a pension plan, resulting from collective bargaining takes effect after one enters employment, the employee, who is represented by the negotiating labor unit, acquires a vested right in the pension benefits upon adoption of the plan and its application to his job category.

Applying the foregoing principles to the present case, we hold that the plaintiff acquired a vested contractual right to pension benefits by reason of his continued employment due to the application of the ILA-WEW Pension Plan executed in 1951 as a result of the 1949 collective bargaining agreements. Although these pension rights can later be enlarged, they cannot be amended detrimentally to his interests in the plan. Once the rights are vested as a result of the contract and continued employment, the plaintiff can be divested only by failing to meet the conditions necessary before payment can be made from the plan's assets. Without a doubt, the plaintiff has a vested right which has matured into a 15 year pension.

We are then faced with the question of whether plaintiff is entitled to a pro rata 15 year pension or a full pension based on 25 years of service. Did the plaintiff's vested right in the pension plan mature to the extent that he was entitled to a full pension based on 25 years of service? We think so.

■ The legal theory giving rise to this conclusion is grounded in estoppel in pais or equitable estoppel. In *Kessinger v. Anderson*, 31 Wn.2d 157, 170, 196 P.2d 289 (1948), we outlined three basic requirements which must be met before estoppel in pais can be applied:

> To constitute estoppel *in pais,* three things must occur: (1) An admission, statement, or act inconsistent with the claim afterwards asserted; (2) action by the other party on the faith of such admission, statement, or act; and (3) injury to such other party resulting from allowing the first party to contradict or repudiate such admission, statement, or act.

A more succinct analysis of the *Kessinger* rules is attained by breaking down the elements as they apply to the facts of the present case.

1. *An admission, statement, or act inconsistent with the claim afterwards asserted.*

 A. Section 5(a)(iii)[1] of the agreement of merger uniting the Northwest Plan with the ILWU-PMA plan authorized the preparing of a schedule and certification of the schedule by the Northwest Plan's trustees to the ILWU-PMA plan's trustees containing the names of those qualifying for a pension under the terms of the Second Amended Northwest Waterfront Pension Plan. Section 3(f), *supra*, of the same agreement allowed the trustees of the ILWU-PMA plan to accept the facts so certified by the trustees of the Northwest Plan as conclusive. The record shows that two schedules were drawn up by the Northwest trustees and sent to the ILWU-PMA plan's trustees. One was a preliminary schedule which was sent to the ILWU-PMA trustees on February 6, 1958. This schedule contained the birthdates and initial employment dates of all covered employees under the Northwest Waterfront Pension Plan. The plaintiff's initial employment date was listed as May, 1936. The purpose of this schedule was to allow the ILWU-PMA plan's trustees to determine whether it would be actuarially sound to go through with the merger. The other schedule was forwarded to the ILWU-PMA plan's trustees on December 10, 1958 after the formal execution of the merger agreement on the 1st of that month. This schedule, which was executed and certified pursuant to the agreement of merger, contained an initial employment date for all covered employees, the number of qualifying years, and also listed non-qualifying years, where they existed, according to information available to the Northwest Plan's trustees. This schedule credited the plaintiff with 22 qualifying years and did not list any non-qualifying years.

---

[1] 5.(a): "The Trustees of the Northwest plan shall prepare schedules and certify them to the Trustees of the ILWU-PMA Pension Plan showing:"

5.(a)(iii): "The number of qualifying years of service prior to January 1, 1958 of every covered employee under the Northwest plan, including both Charter Participants and Participants as such terms are defined in the Second Amended Northwest Waterfront Pension Agreement."

When preparing the final schedule, the Northwest Plan's trustees had in their office employment records of the plaintiff indicating quite clearly that his initial employment from May, 1936 until 1948 was in New York. After the schedule was certified to the ILWU-PMA plan's trustees in San Francisco, some changes were made in the qualifying years of certain longshoremen on the list, but no changes or discussion of possible changes in the status of the plaintiff were ever made.

Therefore, from the date of certification in December, 1958, the plaintiff was considered qualified. In fact, no indication was given to the contrary until his application for a full pension, based on 25 years of service, was reduced to a 15 year pro rata pension for failure to have a sufficient number of qualifying years. Considering the terms of 3(f), *supra,* the defendants cannot now argue that the facts so certified were not conclusive.

B. Furthermore, estoppel can be based on the failure of the trustees of both plans to notify the plaintiff that he did not have 22 qualifying years when he had been so certified. By this action, they can be said to have locked the plaintiff into the pension coverage as of December 10, 1958 with 22 qualifying years. The *Minutes of the Meeting of the Board of Trustees of the Northwest Waterfront Pension Plan* on December 10, 1958 contains the following language:

> The Secretary presented copies of a list which showed the number of qualifying years of each Covered Employee under the Northwest Waterfront Pension Agreement through the year 1957. *The Secretary stated that the list also showed those years which were not qualifying years . . . It was also stated that each individual who had a non qualifying year had been notified by mail, with a copy sent to the Secretary of his Local, and in addition the entire list had been checked with the Secretary of each Local and letters had been furnished by the Locals to this effect and were on file with the Trustees.*

The Trustees then asked whether the ILWU-PMA Pension Agreement would provide an appeal in the event that *additional* information became available which would change the determination. Counsel was of the opinion that under the provisions of the ILWU-PMA Pension

Fund the Trustees of that Fund could determine questions based on *additional* facts which might change the determination of the Northwest Waterfront Pension Fund Trustees. (Italics ours.)

It is clear from the record that the plaintiff was certified with 22 qualifying years. At no time, until his pension application was processed and the pro rata pension granted, was the plaintiff informed that he had any non-qualifying years. In light of the aforesaid *Minutes*, further support for locking the plaintiff into the ILWU-PMA plan with a 25 year pension is evident.

C. From 1958, until the pension application was made in March, 1963, the trustees of the ILWU-PMA pension fund acquiesced in the original number of qualifying years certified to them on December 10, 1958. There were no *additional* facts brought to light which would have changed the original number of qualifying years. The Northwest Plan's trustees had sufficient work records available in their office in 1958 to make a different certification. This was not done and the ILWU-PMA plan's trustees cannot be said to have exercised due diligence in rechecking these same records 5 years later to deny the plaintiff his 25 year pension. Coverage under the plan could only be changed if *additional* facts were brought to the attention of the ILWU-PMA plan's trustees. This was not done and defendants cannot now claim the protection of section 3 (f) of the agreement of merger.

D. The trustees of the ILWU plan did not maintain any agents in the state of Washington to advise eligible employees of their pension rights. The local business agents processed applications for pensions for qualified employees and in doing so they considered the list of certified employees as "our bible" in determining who was qualified to receive pensions. Counsel for defendants referred to the business agents as a "conduit" for the trustees. The local business agents of ILWU Local 52, Leo Scott and Edwin Swanberg, from 1961 through 1964, indicated to the plaintiff that he had 25 years of qualifying time. The plaintiff testified that they told him: "Why don't you retire? You got your 25 years

in." While we are not prepared to find that the business agents of the local unions became the agents of the defendant trustees, it is obvious that the vague and ill defined administrative practices governing the administration of the ILWU-PMA Pension Plan, the certification and failure to notify plaintiff of any non-qualifying years, coupled with the advice of the business agents, who were themselves reasonably misled, gave plaintiff further assurance that he was qualified to retire on the full pension of 25 years. In short, the above evidence indicates that both plaintiff and the business agents were misled and confused by the actions of the ILWU-PMA trustees in administering the plan.

2. *Action by the other party [Dorward] on the faith of such admission, statement, or act.* Basically, the thrust of this rule is that there be some form of reliance on the part of the plaintiff. Sufficient reliance is shown where plaintiff knew of a pension plan covering longshoremen and continued working until he reached age 65. The fact that he intended also to acquire social security benefits at that time is of no relevance.

3. *Injury to such other party resulting from allowing the first party to contradict or repudiate such admission, statement, or act.* Plaintiff was injured when he received a pro rata pension for 15 years of qualifying service instead of a full pension for 25 years of qualifying service. If the plaintiff knew that he was entitled only to a 15 year pro rata pension, as maintained by defendants, he could have remained on the job until he was 68 years of age and increased his pension benefits under the pro rata plan. This he did not do because of the actions of those involved in administering the plan. As a consequence, plaintiff suffered economic detriment.

In summation, it is clear that the doctrine of estoppel in pais, is properly applicable to the facts of this case. All three elements of the doctrine have been met. As a result thereof, plaintiff's vested right to a pension has matured into a full pension based on 25 years of service. Inherent in this analysis is the theory that public policy dictates that complex, vague, and ill-defined administrative practices, gov-

erning the operation of pension plans which result in harm to the covered employees, be construed most strongly against the trustees of the pension plan.

We have considered appellants' assignment of error relating to discretion of the trustees, as well as their other assignments of error. Under the facts of this case we do not find that they have merit.

The judgment of the trial court is affirmed.

HUNTER, C. J., HILL, FINLEY, and HAMILTON, JJ., concur.

*Reported in 451 P.2d 914.