[No. 39780.    En Banc.    April 30, 1970.]

WALTER JACOBY *et al., Respondents and Cross-appellants,*
MATT PLESHA *et al., Appellants,* v. GRAYS HARBOR
CHAIR & MFG. COMPANY *et al., Appellants.**

*A. R. Hart* (of *Martin, Shorts & Bever*), for appellant
Grays Harbor Chair & Mfg. Company.

*Reported in 468 P.2d 666.

*Stanley J. Burkey* (of *Burkey, Marsico, Rovai & Mc-Goffin*), for appellant Continental Assurance Company.

*Merrifield B. Rees* (of *McCormick, Hoffman, Rees & Arnold*), for respondents and cross-appellants.

NEILL, J.—Plaintiffs bring suit against their former employer, Grays Harbor Chair & Mfg. Company, on a pension plan contract between their employer and Continental Assurance Company. The trial court awarded judgments against the employer and the insurance company in varying amounts based upon the present value of pensions payable at age 65. The employer and company appeal. Two of the plaintiffs did not recover and they cross-appeal. For convenience, Grays Harbor Chair & Mfg. Company will be referred to as the employer and Continental Assurance Company will be referred to as the company.

In 1957, the employer contracted with the company for payment of pensions to qualified salaried employees. These pensions were based upon salaries and length of service. The employer agreed to deposit periodically with the company the sums of money which the company determined were required to fund the payments. The company agreed to purchase annuities for employees' pensions as they became payable. The employer reserved the right, with the consent of the company, to modify or amend the contract without the consent of any employee, but the contract specifically provided that no such modification or amendment should deprive any employee of accrued benefits. The employer reserved the right to cease making deposits under the plan at any time. The employees did not participate in any negotiations between the employer and the company, nor were they parties to the contract. They did not contribute from their salaries to the fund.

In December, 1957, the employer wrote a letter to each salaried employee announcing establishment of this pension plan for those who continued their employment until age 65, with other benefits in case of death, disability or termination of employment. A booklet which outlined the benefits of the plan followed later. Thereafter, until 1962, the

employer made regular deposits based upon the number of its employees, their ages, length of service, annual salary and life expectancy.

In 1962, control of the employer was transferred by sale of its capital stock. Thereafter a number of employees, including plaintiffs, were terminated from employment under circumstances tantamount to discharge other than for cause. No deposits have been made to the fund since 1962, but earlier deposits plus accumulated interest are sufficient to meet accrued obligations. At the time of the trial, there were about 10 employees still in the plan. Only one of them had then reached the normal retirement age of 65 and an annuity has since been purchased for him out of the fund.

Defendants' assignments of error raise two main issues. First, they claim that the trial court erred in finding the contract ambiguous and in resolving the ambiguity in favor of the discharged employees. Second, they claim the trial court erred in reducing the pensions to present value and awarding money judgments in those amounts.

An understanding of the issues requires us to examine the contract in more detail. Several terms have been defined by the parties as follows:

(c) Credited Service—The years of a Participant's employment, but not to include the first two years of service or any service prior to age 25 male and female, or service prior to age 30 for female Participants hired after December 1, 1957. Credited service shall be computed to the nearest one-twelfth (1/12th) of a year, subject to a maximum of 30 years.

(d) Participant—Any salaried Employee who meets the eligibility requirements set forth in this Contract.

Eligibility requirements are described in the following language:

6. ELIGIBILITY REQUIREMENTS:

On and after the Effective Date, each full-time salaried Employee of the Employer who was hired prior to his 50th birthday shall be considered a Participant upon completion of two years service and at-

tainment of age 25, except that females hired subsequent to the Effective Date will become Participants only upon completion of two years service and attainment of age 30.

Any Employee not actively at work on the date he would otherwise become eligible will be made eligible from the Anniversary Date nearest his return to active work.

The provision which causes our principal concern follows:

3. BENEFITS ON TERMINATION OF EMPLOYMENT:
All rights to all benefits under the Contract will cease upon a Participant's termination of employment with the Employer prior to retirement except for the following benefits.

If the employment of a Participant is terminated prior to retirement but after he has attained the age of 46 and has completed *at least 10 years as a Participant under the Plan* he shall be entitled to receive a Normal Annuity, commencing at age 65, or upon receipt of application if later, provided that application therefor is made to the Employer by written request signed subsequent to his attainment of age 64½ and prior to age 70. Said Normal Annuity shall be computed as a percentage of his Normal Retirement Benefit, based on credited years of service to the date of termination of employment, as follows:

. . .

Notwithstanding the foregoing provision, if any Participant's termination of employment is the result of a dismissal because of proven dishonesty, proven disloyalty, or a crime involving moral turpitude, no benefits will be payable under the Contract, provided, however, that determinations pursuant to this paragraph shall be made by the Employer on a uniform, equitable and non-discriminatory basis.

(Italics ours.)

Plaintiffs claim they would be entitled to pensions by virtue of this latter section. The employer and the company contend that as the plan became effective December 31, 1957, and these employees terminated in 1962 and 1963, it is impossible for them to have completed "at least 10 years as a Participant under the Plan" and they are not entitled to pensions.

The plaintiffs contend that the contract is ambiguous and that the parties intended to confer benefits upon any employee meeting other requirements and having 10 years of employment. The trial court agreed and concluded that an employee acquired a vested right to a pension, not when the plan had been effective for 10 years, but 10 years after employment commenced and other eligibility requirements were met.

We have held that a pension granted to a public employee is not a gratuity, but is deferred compensation for services rendered and that the obligation of a public employer to pay a pension when the employee has fulfilled the prescribed conditions is contractual in nature. *Bakenhus v. Seattle*, 48 Wn.2d 695, 296 P.2d 536 (1956). This principle has been extended to private pension plans established by collective bargaining agreements. *Dorward v. ILWU-PMA Pension Plan*, 75 Wn.2d 478, 452 P.2d 258 (1969). We here recognize the application of this principle to voluntary, noncontributory (employer financed) pension plans.

The cases now generally hold that where an employer has a pension plan and the employees know of it, continued employment constitutes consideration for the promise to pay the pension. *See* Annot., 42 A.L.R.2d 461 (1955), and cases cited. *Also see* 56 C.J.S. *Master and Servant* § 169, at 828 (1948). A retirement pension is pay withheld to induce continued faithful service. It amounts to delayed compensation for services rendered. *David v. Veitscher Magnesitwerke Actien Gesellschaft*, 348 Pa. 335, 35 A.2d 346, 349 (1944); *Ball v. Victor Adding Mach. Co.*, 236 F.2d 170, 174 (5th Cir. 1956); *Siegel v. First Pennsylvania Banking & Trust Co.*, 201 F. Supp. 664 (E.D. Pa. 1961); *Parsley v. Wyoming Automotive Co.*, 395 P.2d 291 (Wyo. 1964). As the court said in *Ball*, at page 173:

And the idea that a Pension Trust expressly approved, as was this one, by the Internal Revenue Service as a plan qualified under Section 165, 1939 Code, 26 U.S.C.A. § 165; 1954 Code, § 401, 26 U.S.C.A. §§ 401, 402, is a mere gratuity or charitable enterprise beyond even the barest scrutiny by its sole beneficiaries (the employees) is com-

pletely out of keeping with the philosophy and purpose of such plans as the means of paying *additional* compensation to the covered employees in a way to afford substantial and immediate tax advantages to the Employer and substantial tax and monetary benefits to the employees.

And again in *Cantor v. Berkshire Life Ins. Co.,* 171 Ohio St. 405, 410, 171 N.E.2d 518 (1960), the court said:

A retirement program has become a basic part of an employee's remuneration even as his wages are a part thereof, and a consideration flows to the employer as well as to the employee through such a program.

Clearly, under our present economic system, an employer cannot offer a retirement system as an inducement to employment and, after an employee has accepted employment under such circumstances, withdraw or terminate the program after an employee has complied with all the conditions entitling him to retirement rights thereunder.

Therefore, whether a retirement plan is contributory or noncontributory and even though the employer has reserved the right to amend or terminate the plan, once an employee, who has accepted employment under such plan, has complied with all the conditions entitling him to participate in such plan, his rights become vested and the employer cannot divest the employee of his rights thereunder.

■ We have then, in the instant case, not only a contract between the employer and the company, but an implied contract between employer and employee. Where a private pension plan creates a contractual obligation between employer and employee, the rights and obligations of the parties must be measured by the terms of the contract under the ordinary rules of contractual construction. The rights of the employee are limited by the terms of that contract. *See, Rights and liabilities as between employer and employee with respect to general pension or retirement plan,* Annot., 42 A.L.R.2d 461, 472 (1955); *Renshaw v. United States Pipe & Foundry Co.,* 30 N.J. 458, 153 A.2d 673 (1959); *Schneider v. McKesson & Robbins, Inc.,* 254 F.2d 827 (2d Cir. 1958).

■ In *Boeing Airplane Co. v. Firemen's Fund Indem. Co.,*

44 Wn.2d 488, 496, 268 P.2d 654, 45 A.L.R. 984 (1954), we reiterated a basic rule of contract construction:

> Where the terms of a contract taken as a whole are plain and unambiguous, the meaning of the contract is to be deduced from its language alone, and it is unnecessary for a court to resort to any aids to construction.

To the same effect *see Ross v. Harding,* 64 Wn.2d 231, 391 P.2d 526 (1964); *Schauerman v. Haag,* 68 Wn.2d 868, 416 P.2d 88 (1966); *Pepper v. Evanson,* 70 Wn.2d 309, 422 P.2d 817 (1967).

A contract is not ambiguous when a reading of the contract as a whole leads to only one meaning. Where contractual language is unambiguous courts will not read ambiguity into the contract. *Hering v. St. Paul-Mercury Indem. Co.,* 50 Wn.2d 321, 311 P.2d 673 (1957); *Felton v. Menan Starch Co.,* 66 Wn.2d 792, 405 P.2d 585 (1965).

Our reading of this pension plan makes it clear to us that this contract is not ambiguous.

If plaintiffs are eligible for deferred pensions, they must qualify under part 3 of the contract, "Benefits on Termination of Employment." In order to qualify under this section an employee must have "completed at least 10 years as a Participant under the Plan." A participant is defined as "Any salaried Employee who meets the eligibility requirements set forth in this Contract." The eligibility requirements, insofar as relevant, are as follows:

> *On and after the Effective Date,* each full-time salaried Employee of the Employer who was hired prior to his 50th birthday shall be considered a Participant upon completion of two years service and attainment of age 25 . . .

(Italics ours.)

When reading these provisions together, they are susceptible of only one possible meaning: In order to receive benefits for early termination, an employee must have been a participant in the plan for 10 years; one can become a participant only on or after the effective date of the plan (December 1, 1957), depending upon satisfaction of the age and service requirements.

■ However, even if it is conceded, arguendo, that the contract is ambiguous, the trial court misapplied the rules of construction. Where the language of the parties is ambiguous, the principal goal of construction is to search out the intent of the parties. This is done by viewing the contract as a whole in light of the circumstances and conduct surrounding the making of the contract. *Schauerman v. Haag, supra.* Subsequent acts of the parties may also be considered in determining the intent of the parties. *Hastings v. Continental Food Sales, Inc.,* 60 Wn.2d 820, 376 P.2d 436 (1962).

Each employee was furnished with a pamphlet explaining the pension plan. This booklet clearly states the conditions under which a terminated employee may be entitled to a deferred (to age 65) pension. These conditions are four in number, the fourth and concluding condition being: "Your termination date is November 30, 1967, or later." The pamphlet clearly states that the effective date of the plan is December 1, 1957; so this condition of eligibility for pension rights is fully consistent with the other provisions requiring 10 years of employment after the plan is operative.

There is no evidence in the record of an intent to grant retirement benefits under any circumstances before November 30, 1967. To the contrary, the pension plan contract between the employer and the company clearly states "If the employment of a participant is terminated prior to retirement but after he has attained the age of 46 *and has completed 10 years as a Participant under the Plan* he shall be entitled to receive a Normal Annuity, commencing at age 65." (Italics ours.)

Rather than purporting to follow evidence of the intent of the parties, the trial court apparently relied upon the rule of construction that an ambiguous contract is to be construed against the party preparing it. If a contract is equally susceptible of two or more constructions, we agree that it should be construed against the party using the language. Such an approach provides an easy, albeit somewhat arbitrary, method of reaching what would otherwise

be extremely difficult decisions. The rule can be rationalized by saying that the party formulating the language is to blame for the difficulty in interpreting it, and that he could have avoided the problem by more careful draftsmanship. However, when all the evidence of the intention of the parties leads to one meaning of the contract, then it is neither just nor does it make sense to follow this rule of construction by rote to reach an opposite conclusion. The rule should not be applied until called into play by an ambiguity. As we have stated, this pension plan is not ambiguous.

■ Plaintiffs attempt to bolster their position by reference in their brief to equitable estoppel. One of the prerequisites to equitable estoppel is "an admission, statement, or act inconsistent with the claim afterwards asserted." *See Dorward v. ILWU-PMA Pension Plan, supra.* In *Dorward,* an employee was first certified with a certain number of years' service, and then the pension plan trustees later attempted to reduce the accredited years' service after the employee reached retirement age. We held the trustees were estopped from reducing the accredited service. In the present case, we find no admission, statement, act or promise, implied or otherwise, which is inconsistent with defendants' present contention that they have a right to terminate employees and that any employee terminated before November 30, 1967, is not entitled to a pension. There is no evidence of any such admission, statement or act in the trial court's findings of fact, the trial court's oral opinion, the briefs of the parties, or the pamphlet distributed to the employees. Under these circumstances, the doctrine of equitable estoppel cannot be applied.

In summary, the conclusion that plaintiffs are entitled to benefits by this plan can only be reached through a questionable determination that this contract is ambiguous, followed by an equally questionable construction of the contract, and bolstered by an erroneous application of equitable estoppel. Pension plan contracts, by their very nature, are complex instruments, replete with myriad definitions and classifications; but complexity is not ambiguity. The

·contract before us .contains none of the inconsistencies or anomalies generally associated with determinations of ambiguity.

It is important to note that the pension contract provides that upon termination of the plan (it being a voluntary plan terminable at the will of the employer), all moneys held by the insurance company shall be distributed for the benefit of employees. Under no circumstances will these moneys revert to the employer.[1]

The trial court expressly found that the pension plan contract has not been terminated; so the distribution plan is not operative. We point this out only for the purpose of illustrating that this contest is not between terminated employees and an employer who will receive the funds if plaintiffs do not, but that the real issue is whether the funds now in the hands of the insurance company[2] should go to these plaintiffs or to those employees of Grays Harbor Chair who are still participants in the plan.

It may seem unfair to declare a pension plan to be compensation and then deny an employee who is not at fault the fruits of this compensation. But the extent of this compensation is limited by the terms of the contract, and many cases have held that an employee who is not at fault but

---

[1] In employer's letter to the Internal Revenue Service wherein tax deduction for contributions to the plan was sought, it is stated:

*Distribution upon Termination*—Paid-up annuities beginning not earlier than age 65 as follows:

a. First priority equally to participants over 65;

b. Second priority equally to previously vested rights; and then

c. Pro-rata distribution of accrued but previously invested [*sic*] [unvested] rights.

[2] This type of pension plan is commonly known as a deposit administration fund. The insurance company merely acts as custodian of the money contributed by the employer and annually advises the employer as to the amount of money which should be deposited to keep the fund actuarially sound, based on the then current status of participating employees. No specific allocation is made to individual employees. No annuity is purchased for an employee until the man actually retires, at which time sufficient moneys are withdrawn from the fund to purchase an annuity for the retiree. The terms of the annuity are a matter between the insurance company and the retiree based on the option and election open to the employee at the time under the provisions of the pension plan.·

who does not fall within the contractual requirements may not recover pension benefits. *See* the cases collected in 42 A.L.R.2d 461, 475-80 (1955). While these results may seem inequitable in a particular case, the alternative would be to hold that the adoption of a pension plan of any type creates an immediate enforceable monetary right in employees, irrespective of the terms of the contract. Such a course would severely limit the adoption of purely voluntary pension plans not required by statute or collective bargaining agreement; and would further benefit terminated employees at the expense of continuing and future employees.

In view of our determination that plaintiffs are not entitled to pensions under the terms of the plan, we need not discuss the issue of the conversion of the annuities provided for under the contract to current cash payments.

The denial of recovery to cross-appellants Plesha and Walker (employees determined by the trial court to be ineligible for benefits) is correct. The record establishes that these two plaintiffs fail to meet the age and tenure requirements of the plan.

The judgment is reversed as to all plaintiffs except Plesha and Walker, as to whom the judgment is affirmed.

HUNTER, C. J., FINLEY, WEAVER, HAMILTON, HALE, and McGOVERN, JJ., concur.

ROSELLINI, J. (concurring in the result)—I concur reluctantly in the majority's conclusion that the contract does not provide any pension for a discharged employee who has not served 10 years "under the plan," in other words, after the inception of the plan and while it is in operation.

The language describing "credited service" might create in the mind of a reader who did not study the contract as a whole the impression that such service is the same as service "as a participant under the plan." But we must assume that the parties relying on the contract have read it in its entirety, and such a reading reveals clearly that "credited service" is an important factor in determining the amount of pension which an employee shall receive, but it is not the same thing as service "as a participant under the plan."

The requirement of 10 years' employment after the inception of the plan in order for a discharged employee to qualify as a pension recipient appears unjust to me, particularly when it is considered that an employee may have worked 30 years before the inception of the plan and may be denied a pension, while another employee who has worked only 12 years will be granted a pension simply because 10 of those years were served after the inception of the plan.

To better understand the unfairness, the Grays Harbor Chair & Mfg. Co. had some 272 employees at the time the plan was created, of which 22 were salaried and participants under the plan. It was decided that the plan would include only "salaried employees who were the executive group of the company." The reason that the plan was created, as testified by the officers, was to keep a winning team together which in the past had created a profitable business, to keep this group of valued employees from attempting to find other employment, and to forestall the possibility of demands for higher salaries.

The contributions for the plan were made in full by the employer and the employee was not required to contribute. However, they did contribute in another way. The company had instituted the practice of bonus payments on profits and it was testified that the retirement plan cost approximately $25,000 per year, and that in one or two years, because of the deterioration of the profit picture, they were given reduced bonuses.

However, the question whether provisions of this nature are contrary to public policy is one which must be decided by the legislature. We cannot legitimately twist the words of a plainly written contract, omit words, or substitute words to achieve a result which may appear to us to be more in accord with justice than the provisions of the contract, where there is no statute or rule of law which makes that provision illegal. And here it is not contended that the contract is unlawful.

We have no choice but to reverse.