[No. 32710.  Department Two.  March 30, 1954.]

BOEING AIRPLANE COMPANY, *Respondent*, v. FIREMEN'S FUND INDEMNITY COMPANY *et al.*, *Respondents*, EAGLE STAR INSURANCE COMPANY, LTD., *et al.*, *Appellants.*[1]

*Skeel, McKelvy, Henke, Evenson & Uhlmann,* for appellants.

*Holman, Mickelwait, Marion, Black & Perkins* and *J. Paul Coie,* for respondent Boeing Airplane Company.

*Brethorst, Fowler, Dewar, Bateman & Reed,* for respondents Firemen's Fund Indemnity Company *et al.*

DONWORTH, J.—This suit was instituted against four insurance companies to determine which of two mutually exclusive types of public liability insurance policies cover certain losses suffered by plaintiff as a result of the crash of a B-50 bomber plane owned by the United States. For several months prior to the crash, plaintiff had been engaged in doing modification work on the plane pursuant to a government contract.

The trial court entered judgment for plaintiff against defendants Eagle Star Insurance Co., Ltd., and American Fidelity & Casualty Company. The judgment dismissed the complaint as to defendants Firemen's Fund Indemnity Company and United States Fidelity & Guaranty Company.

Eagle Star Insurance Co., Ltd., and American Fidelity & Casualty Company have appealed.

Respondent Boeing Airplane Company will be referred to hereafter as Boeing, appellants Eagle Star Insurance Co., Ltd., and American Fidelity & Casualty Company will be called the liability insurers, and respondents Firemen's Fund Indemnity Company and United States Fidelity & Guaranty Company will be designated as the products insurers.

The parties entered into a lengthy written stipulation setting out most of the facts in the case. The only witness called to testify was Boeing's assistant director of contract administration. It was provided in the stipulation that

" . . . the matters herein stated may, for the purpose of the trial and disposition of this action, be taken as true and shall be deemed in evidence herein without the necessity of introducing any other testimony or evidence thereof,"

though each party reserved the right to object to the relevancy or materiality of any of the stipulated facts. Thus there is no dispute as to matters of fact in this case.

The agreed facts, in so far as we need to notice them on this appeal, may be summarized as follows:

On October 1, 1950, each of the products insurers issued to Boeing identical insurance contracts which are referred to as products liability insurance policies. The policies obligated the products insurers to pay to Boeing such sums as it might become obligated to pay to third persons as damages because of any accident arising out of hazards which were defined in the policies in these terms:

"The handling of, the operation of, the use of, a warranty of, or the existence of any condition in, . . . *aircraft products* manufactured, sold, assembled, repaired, serviced, handled or distributed by the named insured . . ., *if the accident occurs after the Insured has relinquished possession thereof to others and away from premises owned, exclusively rented or controlled by the Insured.*" (Italics ours.)

The policies also provided:

"This policy does not apply:

"(a) To the maintenance or use of any aircraft . . . *in flight by or for the account of the insured.*" (Italics ours.)

On December 31, 1950, the liability insurers issued to Boeing aviation liability insurance policies requiring the insurers to pay to Boeing such sums as it should become obligated to pay as damages because of an accident arising out of the ownership, maintenance, or use of aircraft. The policies described the aircraft covered thereby in this language:

"5. Aircraft covered:

"This Policy shall automatically attach and apply with respect to any aircraft which is owned or operated by or in the possession of the Named Insured, . . . *but excluding Products Liability claims.*" (Italics ours.)

The parties in their stipulation agreed that the phrase "but excluding Products Liability claims" was intended to exclude all claims covered by the products liability policies,

the result being that the coverage afforded by the two types of policies is mutually exclusive.

The modification work that was being done by Boeing on the B-50 bomber prior to the crash was being performed pursuant to the terms of several contracts between Boeing and the United States. For the purpose of this case, those contracts may be considered as one contract. It is not necessary to set out in detail the terms thereof, since the primary problem on this appeal is to construe the insurance policies—not to interpret the contracts between Boeing and the government. For our purpose, the several contracts may be briefly described as follows:

By the contracts, Boeing undertook to modify this plane and several other planes in certain particulars in accordance with a certain cost-plus fixed fee contract. Boeing was to be reimbursed by the United States for the equipment and materials incorporated into the plane during modification and for the cost of labor used in doing the modification work. The government paid Boeing from time to time ninety per cent of the cost of the materials, equipment, and labor used for this purpose as the work progressed, but retained ten per cent of the sums payable under this contract until completion and acceptance of each particular modification job. Final payment to Boeing for reimbursement for the last costs accrued prior to completion of the work and for the retained percentage and fixed fee was not to be made until all of the modification work on all of the planes was completed and had been accepted by the government.

As evidence of the completion of work and of the acceptance by the government of each plane modified under the contract, it was necessary for Boeing to have a document called a material inspection and receiving report filled out and signed by a government representative for each plane as it was accepted. The material inspection and receiving reports contained this language:

"I certify that the items listed herein have been inspected by me or under my supervision. They conform to the contract, and have been accepted."

On August 10, 1951, Boeing considered the modification work on the plane completed, but the plane had to have a test flight before it would be accepted by the government. Under the contract, the government had the option of combining the separate initial and acceptance flights so that only one flight would be held to test the modified planes. It also had the option of conducting the test flight itself with Air Force personnel or having Boeing make the test flight.

On that date, the government elected to combine the initial and acceptance flights so only one test would be necessary if no malfunctions were discovered. On this test flight, the plane was flown by a crew of six Air Force men, with Lieutenant Lloyd Vanderwielen, the pilot, in command of the ship. As a result of this flight (lasting ten minutes), the pilot noted on his flight report that the No. 4 propeller ran up to 3100 R.P.M. on take-off and would not reduce speed. The pilot's report called for a "reflight" of the plane after repairs were completed.

Boeing undertook to make these repairs, and on August 13, 1951, the plane went up on a second test flight scheduled to last an hour and a half. Lieutenant Vanderwielen was in command as pilot. Two other Air Force men and three Boeing employees (borrowed by the Air Force for the flight) made up the crew.

Two minutes after it took off, the plane crashed into an apartment building several miles from the Boeing plant in Seattle, causing death or injury to persons and destruction or damage to property.

If the plane had performed satisfactorily on the August 13th flight, the parties stipulated, it would have been returned to the King County Airport adjacent to the Boeing plant and parked either in an area of the airport exclusively controlled by Boeing or in an area within which Boeing had a parking privilege under its lease with King county. In either event, Boeing guards would have protected the plane, excluding unauthorized persons from access to it.

Boeing would then have been obligated under the contract to correct any deficiencies within the scope of the con-

tract which were disclosed by the test flight, and if such deficiencies affected the flight capabilities of the plane, another test flight would have been required.

. If the plane had returned from the August 13th flight without any malfunctions or deficiencies being discovered, these things would have remained to be done: (1) execution of an Air Force acceptance form by one Boeing and three government representatives; (2) the signing of an inventory of the property aboard the plane by representatives of both parties; (3) execution of a material inspection and receiving report by Boeing and a government representative; (4) filling the plane with fuel by Boeing for the fly-away (delivery) flight; and (5) execution of a flight release form for the fly-away flight by a Boeing and a government representative.

No material inspection and receiving report on the plane had been made prior to the crash. However, such a report was executed on the day after the crash by an Air Force inspector signing the necessary certification. The report contained a notation that the plane had crashed and been destroyed.

Boeing's assistant director of contract administration testified that this report was executed after the crash to "show completion of the work [on the plane] as related to the total contract in order to permit final payment."

It was stipulated:

" . . . that the crash was caused by the mechanical failure in flight of the No. 4 propeller gear reduction system . . . which had been defectively manufactured by Curtiss-Wright Corporation and sold to the United States Air Force,"

which shipped it to Boeing for installation on the ill-fated plane. Curtiss-Wright and Boeing entered into an agreement providing that Curtiss-Wright would pay seventy per cent of the damage claims resulting from the crash and Boeing would pay thirty per cent of such claims.

The insurance policies issued by the products insurers and those issued by the liability insurers were all in effect at the time of the crash, and both sets of insurers approved the

settlement arrangement between Boeing and Curtiss-Wright. At the time of the trial of this suit, Boeing had paid out $58,173.79 as its share of the claims.

The trial court, on the basis of the stipulated facts, made a finding of fact that Boeing had not relinquished possession of the plane at the time of the crash and a finding that the loss was covered by the terms of the policies issued by the liability insurers. The court made a further finding that the plane was at the time of the crash "in flight by or for the account of the plaintiff."

The trial court also entered a conclusion of law to the effect that the airplane had been delivered by the government to Boeing under a bailment, and that the relinquishment of custody of the plane, by Boeing to Lieutenant Vanderwielen on August 13, 1951,

". . . was only for a limited and temporary purpose in accordance with the terms of the contracts and was a conditional relinquishment for only a 1½-hour acceptance test flight, during which time the plaintiff was in possession of said airplane."

Based upon its findings and conclusions, the trial court entered judgment for Boeing against the liability insurers for the stipulated amount paid in settlement of the damage claims, from which judgment they are prosecuting this appeal.

The liability insurers have conceded in this case that the use of the phrase "but excluding Products Liability claims" in their policies makes the policies issued by the two sets of insurers mutually exclusive. The liability insurers concede also that the limit of coverage of the policies they issued Boeing is determined by the applicability of the products policies. In other words, the only way the liability insurers can avoid liability in this case is to convince the court that the loss falls within the terms of the products policies.

Therefore, the major problem on this appeal is to construe pertinent language of the products insurance policies to determine whether the loss does or does not fall within the coverage afforded by those policies.

Under the specific provisions of the products policies, there can be no coverage and the judgment must be affirmed if (1) the accident occurred before Boeing had relinquished possession of the plane to others, or (2) if the plane was "in flight by or for the account of" Boeing.

Before turning to a consideration of appellants' fourteen assignments of error, we will discuss some of the principles which this court has followed in construing contracts, since our problem is to arrive at a correct interpretation of the language used in the products insurance policies.

The primary factor to be considered in determining the meaning of a written contract is the *intention of the parties*, and that intention normally is to be ascertained largely from the language employed by them. *Grand Lodge of the Scandinavian Fraternity of America v. United States Fidelity & Guaranty Co.,* 2 Wn. (2d) 561, 98 P. (2d) 971.

Where the terms of a contract taken as a whole are plain and unambiguous, the meaning of the contract is to be deduced from its language alone, and it is unnecessary for a court to resort to any aids to construction. *Bellingham Securities Syndicate v. Bellingham Coal Mines,* 13 Wn. (2d) 370, 125 P. (2d) 668; *Finch v. King Solomon Lodge No. 60,* 40 Wn. (2d) 440, 243 P. (2d) 645. But where the language of a contract is ambiguous or susceptible of more than one meaning, it is the duty of the court to search out the intent of the parties by viewing the contract as a whole and considering all of the circumstances surrounding the transaction, including the subject-matter and the subsequent acts of the parties. *Seattle v. Northern Pac. R. Co.,* 12 Wn. (2d) 247, 121 P. (2d) 382; *Burch v. Rice,* 37 Wn. (2d) 185, 222 P. P. (2d) 847.

In this case the principal controversy is over the meaning of the word "possession" used in the insurance policies written by the products insurers. The United States supreme court said in *National Safe Deposit Co. v. Stead,* 232 U. S. 58, 58 L. Ed. 504, 34 S. Ct. 209:

"There is no word more ambiguous in its meaning than Possession. It is interchangeably used to describe actual

possession and constructive possession which often so shade into one another that it is difficult to say where one ends and the other begins."

Since the products policies are made ambiguous by the use of the word "possession," we must ascertain the intention of the parties to those insurance contracts by reference to the facts and circumstances surrounding the making of the contracts, as well as by viewing the contracts by their four corners.

Appellants' assignments of error Nos. 1, 5, 7, 9, 10, 11, 12, 13, and 14 challenge the trial court's ruling that on the August 13th flight Boeing was in "possession" of the plane as a bailee for the purpose of doing modification work on the aircraft.

Appellants argue that there are only two kinds of possession—actual physical possession or constructive possession. Their opening brief makes an engaging argument to the effect that during the flight of August 13th, Boeing did not have physical possession, since the plane was in control of an Air Force lieutenant, and further that Boeing did not have constructive possession, inasmuch as that term is "an expression used to describe the relation between the owner of property and the property when the actual possession is not in the owner." Because Boeing did not own the plane, Boeing could not have constructive possession of it, the liability insurers argue.

Appellants' opening brief ignores the subject of bailments, despite the fact that the trial court concluded that Boeing's possession of the airplane was such possession as a bailee has when goods are put into his hands for repairs or modification. Respondents (the products insurers) base their contrary argument on the proposition that Boeing accepted possession of the plane from the government under a bailment, that possession on the part of a bailee is presumed to continue until the contrary is established, and that under the facts in this case Boeing's act in allowing the Air Force to test fly the plane did not end the bailment and consequently did not amount to a relinquishment of Boeing's possession as a bailee.

Appellants discuss this issue (whether Boeing's possession was that of a bailee) for the first time in their reply brief and argue that the rules of bailment have no application in this case.

We agree with the trial court's conclusion that the plane was delivered to Boeing under a bailment. It was stipulated by the parties that "For the purposes of said [modification] contract, said airplane was furnished to plaintiff by the owner, the United States of America."

This court held in *Lewis v. Jensen*, 39 Wn. (2d) 301, 235 P. (2d) 312, that a bailment resulted when the owner of an airplane left it with the operators of a firm engaged in selling, repairing, and checking airplanes for the purpose of having the plane serviced.

We agree also with the trial court's conclusion that, at the time the plane crashed, the bailment contract had not ended, and that consequently Boeing retained possession of it *as a bailee*. At least until a material inspection and receiving report had been made out to signify the government's recognition of completion of the work on the plane, Boeing must be held to have retained possession of the plane under the contract.

However, even if we disregard the material inspection and receiving report, we come to the same conclusion. We believe that, when the No. 4 propeller gear reduction system began malfunctioning on the August 13th flight (which according to the stipulation caused the crash), Boeing became obligated under the cost-plus contract to do more work on the plane, and consequently the bailment contract could not have been at an end.

Therefore, since we hold that Boeing had a bailee's possessory interest in the plane at the time it crashed, the question is whether Boeing and the products insurers had that type of "possession" in mind when they provided that the coverage afforded by the products policies would attach

". . . . if the accident occurs after the Insured has *relinquished possession* thereof to others . . . ." (Italics ours.)

The liability insurers, now that the plane has crashed and claims aggregating more than fifty thousand dollars must be paid by one of the two sets of insurers, insist that it was the intention of Boeing and the products insurers to use the word "possession" only to signify *actual physical possession.*

On the other hand, the products insurers insist that it was their intention and that of Boeing, by the use of the word "possession" in their policies, to include such possession as a bailee has over bailed goods temporarily out of his physical custody.

Boeing has expressed no opinion as to its intention at the time the policies were issued, since it is neutral as to which group of insurers is liable to it.

· [5]   In this situation, we must apply this rule:

" 'The first and best resort in the construction of contracts is to put oneself in the place of the parties at the time the contract was executed—to look at it in prospect rather than retrospect—for, when money disputes have arisen, the perspective is apt to be clouded by the unexpected chance of gain or self interest.' " *Long-Bell Lbr. Co. v. National Bank of Commerce,* 35 Wn. (2d) 522, 214 P. (2d) 183.

From a consideration of the products policies as a whole and taking into account the circumstances in which Boeing and the products insurers found themselves at the time the policies were issued, we reach the same conclusion that the trial court did, that is, we believe that it was the intention of Boeing and the products insurers to use the word "possession" in the policies in its broadest sense.

We arrive at that conclusion · because the record shows that at the time the products policies were issued Boeing was actively engaged, under the terms of contracts with the government, in doing modification work on a number of Air Force planes.   It seems only reasonable to us, viewing the contracts from the situation of the parties at the time these policies were issued, that both Boeing and the products insurers intended to include in the word "possession" the type of possession Boeing exercised over the planes on which it was then engaged in performing modification work.   All of the parties must have had actual, or at least

constructive, knowledge that the government had the right to conduct the test flights before accepting delivery of the modified planes.

Since at the time these policies were issued Boeing was in possession of a number of Air Force planes as a bailee, Boeing must have intended to have its insurance contracts so drawn as to take cognizance of the fact that it was engaged in an extensive plane modification program as a bailee and to cover risks arising in connection with such work. Furthermore, the products insurers (as well as the liability insurers) were contracting with Boeing so as to extend complete insurance coverage to Boeing to protect the company from liability claims arising out of every phase of its operations. Under those circumstances, it seems reasonable to believe that the products insurers intended to use the word "possession" in their policies to include every type of possession that Boeing was at that time exercising over airplanes.

Therefore, we hold that Boeing and the products insurers used the word "possession" in the products policies to include such possession as a bailee has of bailed goods. Inasmuch as Boeing had possession of the plane as a bailee at the time of the crash, it follows that the products insurance did not cover the loss and that, therefore, the loss must necessarily fall within the terms of the liability insurance policies.

We could dispose of this appeal on the basis of our interpretation of the word "possession" as used in the products policies. However, the liability insurers' assignment of error No. 10 also challenges the trial court's finding that the plane was at the time of the crash "in flight by or for and on account of the plaintiff," so we will consider that issue also.

The word "account" as used in the products policies means for the advantage, profit or benefit of Boeing. The liability insurers urge that the flight was wholly for the benefit of the government.

In their brief, the liability insurers say:

"Although it is not explicitly stated in the record, it is clear from what is before the court that the purpose of these acceptance flights was to determine whether the remodelling and repairs made on the plane were satisfactory in flight and whether or not the plane was generally airworthy.

"Now it may be true that in such a test by the customer, there is some indirect advantage to the producer. Nonetheless all rational people would agree that when an airplane is taken up by a customer under circumstances such as these, the flight is for the customer's advantage or benefit and not on behalf of the producer."

We disagree with this analysis. Boeing could not be paid in full until the plane had been successfully test flown, thereby demonstrating that the work had been completed in accordance with the contract. The successful completion of a test flight would result in a direct financial benefit to Boeing. That being the case, the flight was "by or for and on account of Boeing."

Assignments of error Nos. 2, 3 and 4 are directed to those findings of fact in which the court set out portions of the contract between Boeing and the government which the court felt were "material." Appellants urge that much more of the contracts than those parts set out in the findings must be considered material. We agree. Consequently, we have examined all of the terms of the contracts between Boeing and the government, but, after doing so, we come to the same conclusion as the trial court did on the meaning of the words "possession" and "account" in the products policies.

Assignment No. 6 and a part of No. 7 point out minor errors in the findings of fact. In setting out the facts at the beginning of this opinion, we accepted appellants' version of the facts as stated in these two assignments. These errors have no effect on the validity of the trial court's conclusions or judgment, however.

The remaining assignment of error (No. 8) has been disposed of by our prior discussion of the meaning of the word "possession" as used in the products policies.

Because we are convinced that the trial court was correct in holding (1) that Boeing was in possession of the plane at the time of the crash, and (2) that the flight was for the account of Boeing, and (3) that its loss resulting from the plane crash was covered by the liability policies, the judgment must be, and is, affirmed.

GRADY, C. J., SCHWELLENBACH, HILL, and WEAVER, JJ., concur.

