[No. 78-40694-1.    Division One.    November 3, 1969.]
Panel 1

THE CORNELIUS APARTMENT HOTEL CORPORATION, *Respondent,* v. W. R. ALABASTER *et al., Appellants,* R. B. DUNN *et al., Respondents.*

*Merges, Brain & Hilyer,* for appellant.

*Riddell, Williams, Voorhees, Ivie & Bullitt,* for respondent.

SWANSON, J.—The respondent, Cornelius Apartment Hotel Corporation, sued W. R. Alabaster for damages and to remove him from the hotel premises on the basis of breach of contract. Alabaster was ousted by a temporary injunction. He cross complained for damages. The trial court, in concluding that Alabaster had breached his employment contract, upheld the ouster, awarded the hotel

corporation $1 in damages, and dismissed appellant's cross complaint.

The record discloses *inter alia* that after having managed The Cornelius Apartment Hotel at 3rd and Blanchard in Seattle for approximately 33 years with virtual carte blanch authority from the owners, W. R. Alabaster, in October of 1961, entered into a written contract of employment with the respondent corporation, the new owner of the apartment-hotel building. The harbinger of trouble to come was the sale by the respondent corporation of all of its stock to one Lanning on December 31, 1963. Lanning knew of Alabaster's employment contract and took subject to it, and the appellant recognized Lanning as the corporation's agent. Lanning and Alabaster did not agree on all matters concerning The Cornelius. As the court found in finding of fact No. 6, Lanning wanted the hotel switchboard removed. Alabaster would not remove it. Alabaster refused to comply with Lanning's direction to terminate the services of two employees in the building upon removal of the switchboard. He refused to put into effect a new rental schedule as directed by Lanning. Alabaster sent Lanning a letter[1] dated March 6, and postmarked March 19, 1964,

---

[1] "Gentlemen: Reference is made to the Employment Agreement of October 31, 1961, entered into between the Cornelius Apartments, Inc., as 'first party' and myself as 'second party'. As we have already discussed, you, as purchaser of the Cornelius Apartments, have taken subject to the provisions of this Agreement and as you also know under paragraph 4, I am designated as 'general manager' of the Cornelius Apartments and have 'full power and authority to manage and operate the apartment in the same manner as he (Alabaster) has done in prior years, including the sole power to hire and discharge and supervise all employees'.

"In view of your recent instructions including a direction to remove the switchboard, and, to give certain employees notice of possible dismissal, I have consulted my attorneys, who advise me that acquies[c]ence in those of your instructions which are against my better judgment, might be construed as a waiver of my rights under this contract.

"Therefore in view of the matters above stated I have no alternative but to decline your instructions relating to the employees. However, I fully appreciate the fact that you are presently contract purchasers of the Cornelius and have vital interest therein and I wish to cooperate

which declined Lanning's instructions relative to the employees. With regard to this letter, the trial court, in its oral opinion, stated:

> Mr. Alabaster in his letter of March 6, 1964 says, "As we have already discussed, you, as purchaser of the Cornelius Apartments, have taken subject to the provisions of the agreement," and recites "You are presently the contract purchaser and we are both bound by the agreement."
>
> . . . and in that letter of March 6, he said to the corporation employee, "I have a contract of employment and I refuse to acquiesce in your instructions because of the way I interpret the contract." When Mr. Alabaster did that, he breached the contract.

On March 27, Lanning responded with a letter[2] to Alabaster which advised him that this employment contract had been terminated. Subsequent to this event the trial court found that Alabaster continued to assert his authority as manager. He countermanded Lanning's instructions to the telephone company to remove a switchboard and countermanded a direction to a telephone answering service regarding the hotel. Alabaster directed tenants to make their checks payable to himself personally or to cash; he

with you in every way possible and consistent with the terms of the Agreement by which we are both bound. I would therefore welcome the opportunity to discuss this matter with you or your representatives in the office of my attorneys at such time as may meet our mutual convenience.

"In conclusion, I wish you to understand that my primary object is the continued successful operation of the Cornelius and my best efforts will always be directed toward this end which of course is for your benefit, as well as the contract seller[']s, and my own.

"Sincerely yours, W. R. Alabaster"

[2]"Dear Mr. Alabaster: As you know prior arrangements had been made for the removal of the switchboard from the Cornelius Apartment Hotel, pursuant to instructions and arrangements made directly by me as the purchaser of all of the outstanding stock of Cornelius Apartment Hotel Corporation. In addition, instructions had been given for issuance of notice of termination of certain employees most of whose positions would have been rendered unnecessary by reason of the removal of the switchboard.

"Your deliberate refusal to carry out the instructions relating to the employees and now the direct countermanding of instructions for removal of the switchboard make the continuance of the present relation-

deposited all the income into a new checking account and excluded Lanning from any right of drawing against the account. He also ordered Lanning not to talk to any of the employees of the hotel and not to interfere with any of its operations. Thereafter, legal proceedings were commenced and the appellant ousted from the premises.

■ The appellant first assigns as error the trial court's findings of fact related above describing the conduct of the parties. The record supports the trial court's factual determinations, and therefore we will not disturb them. *Thorndike v. Hesperian Orchards, Inc.*, 54 Wn.2d 570, 343 P.2d 183 (1959); *John R. Hansen, Inc. v. Pacific Int'l Corp.*, 76 Wn.2d 220, 455 P.2d 946 (1969).

The balance of the appellant's assignments of error are argued together and will be considered as one in that they raise only the issue of whether or not the trial court properly concluded that the appellant had breached his contract of employment.

The pertinent provisions of the contract are:

(1) *Employment.* . . . Alabaster agrees to accept such employment and to devote his time diligently to the performance of the duties of such office [general manager] and to give his attention and best efforts to the business of the corporation and to exert himself for the interests, benefit, profit and advantage of the corporation. . . .

---

ship impossible and the continuance of yourself in any management function relating to the corporation intolerable.

"I therefore have no alternative but to advise you that by reason of your actions made in total breach of your employment agreement dated October 31, 1961, that your employment thereunder is hereby terminated and that any and all further rights or interest under said contract are likewise terminated. It is requested that you forthwith deliver to me all monies, books, records, keys and other property of the corporation now in your possession or subject to your control. Demand is herewith made upon you also for immediate vacation of the premises occupied by you in the Cornelius Apartment Hotel. In this connection, two weeks should be ample time for making of other living arrangements and the removal of all of your property from the premises.

"It is regretted that this action has become necessary but under the circumstances there is no alternative. Very truly yours, Jack Lanning."

(4) *Duties and Authority.* Alabaster, as general manager, shall have the duties of management and operation of the apartment which are normal to such position. He shall have full power and authority to manage and operate the apartment in the same manner as he has done in prior years, including the sole power to hire and discharge and supervise all employees; provided, however, that Alabaster shall not incur any one expenditure in an amount exceeding Two Thousand Dollars ($2,000.00) . . . without the express consent of the corporation's agent; and provided further, however, that Alabaster shall at all times act in good faith and consistently with the interests of the corporation.

. . .

(7) *Termination.* . . . Further, in the event Alabaster should be guilty of misconduct or flagrant neglect of duty, or should he fail to keep and perform the several terms and conditions of this agreement on his part to be kept and performed, then the corporation, at its election, may terminate this agreement and all rights of Alabaster shall thereupon cease and terminate.

Appellants contend that the provision of the contract which states, "He shall have full power and authority to manage and operate the apartment in the same manner as he has done in prior years, including the sole power to hire and discharge and supervise all employees;" entitled or required Alabaster to run the apartment in the same fashion as he had done for the prior owners which included making virtually every decision without approval, short of selling the building. In other words, appellants feel that Alabaster should run the building as if it were his own and was limited only by the provision which stated, "Alabaster shall at all times act in good faith and consistently with the interests of the corporation." This means, appellants say, in the absence of evidence showing that Alabaster acted either in bad faith or contrary to the interests of the corporation, his actions could not be interfered with by the owners. Appellants further contend that Alabaster's letter of March 6 at best could be described as a case of "anticipatory breach" which could not be established since the appellant's letter offered to negotiate further. Appellant

argues that Lanning's letter of March 27 actually terminated the contract and prevented the appellant from performing.

Respondent concedes that the contract gave Alabaster rather broad powers but points out that it also contains some limitations. Alabaster agreed "to exert himself for the interests, benefit, profit and advantage of the corporation" and to "act in good faith and consistently with the interests of the corporation." Any expenditure by Alabaster was limited to $2,000 in the absence of express consent of the corporation's agent. The contract also described Alabaster's position as general manager and said, "shall have the duties of management and operation of the apartment which are *normal to such position.*" It contemplated that he would consult with the corporation's agent. It is therefore obvious that while Alabaster possessed wide discretion, he was also subjected to limitations.

█ As was so ably stated in 4 S. Williston, A Treatise on the Law of Contracts § 602, at 323 (3d ed. Jaeger 1961):

> Interpretation is properly the process of applying the ordinary legal standard to the words or symbols used in order to determine their meaning or sense, and rules of interpretation are adopted for this purpose.

Perhaps the most fundamental concept used by the court is that the intent of the parties must be ascertained by reading the contract as a whole. *Truck Ins. Exch. v. Rohde,* 49 Wn.2d 465, 303 P.2d 659, 55 A.L.R.2d 1288 (1956). See *Boeing Airplane Co. v. Firemen's Fund Indem. Co.,* 44 Wn.2d 488, 268 P.2d 654, 45 A.L.R.2d 984 (1954). Once the parties' intent is ascertained that intent must control. *Silen v. Silen,* 44 Wn.2d 884, 271 P.2d 674 (1954).

The trial judge, in applying the "ordinary legal standard" to this contract, states in his oral opinion:

> To say that the contract requires those people to treat him like a trusted son or brother and let him run the property, to say that that means that he has a right to kick them off the place and act as the owner is just absurd. No contract could be so interpreted. One cannot bring back the past. The situation had changed.

The provision in the contract that it must be run and managed consistent with the interest of the corporation cannot possibly mean consistent with the interest of an inanimate building. It does not mean consistent with the interest of the manager, which had been one of the big factors in the past years. It means consistent with the interest of the corporation that owns the building and wants to make some money of it.

Mr. Lanning made a decision that he wanted to remove the switchboard. That is the type of decision the owner of a building makes. The manager cannot say to the owner of the building, "No, you cannot do that, because I have the right to hire and fire employees." The right to hire and fire employees means just that, that if employees have to be hired or fired, this is going to be one of the tasks of the manager, but to say that that means that the owner, during the period of the management contract, cannot change the operation of the business at all, and that he cannot take the switchboard out because it would change the business and someone would have to be fired, is not an acceptable interpretation of the contract provisions. If the owner of the building decides he wants to change the operation so as not to have a switchboard, if someone has to be hired to take care of some new duties, if someone has to be let go to take care of duties they have been doing, that is the manager's job to take care of that.

After whatever action Mr. Lanning took on March 27, where he purported to fire Mr. Alabaster, Mr. Alabaster then defiantly usurped the corporation from the owner. Mr. Lanning, as agent of the corporation, had the right to deal with Mr. Alabaster at that time. Mr. Alabaster countermanded everything Mr. Lanning did. He wanted Mr. Lanning to quit interfering. He told the tenants not to pay any attention to him. He told the tenants to pay money to him as manager. He put that money in his own account and truly seemed to feel he was the owner, and that running things in the interest of the corporation for thirty-some years.

Running it in the interest of the corporation means running it the way the corporation and its owners wanted the building run so long as it treats him properly as the manager.

Appellants' contention that Alabaster was acting for the

best interests of the corporation, since under Lanning's direction the hotel was a financial failure while under his direction in prior years it was a success, is patently unsound. A corporation can manage its assets as it, not as its manager, deems best. It is pure sophistry to argue that the contract authorized the appellant to countermand the policy decisions of the owners of the building to remove the switchboard, to fire employees, and to establish the rents. It is clear beyond further discussion that the trial court was correct in interpreting the contract as it did in deciding that the respondent corporation had the right to make its own policy decisions and make its own mistakes in the operation of the building.

Disposition of this issue leaves little to appellant's contention that respondent was in fact the one who breached the contract. The trial court found, and we think rightfully under its interpretation of the contract, that when Alabaster declined in his letter to acquiesce in respondent's policy decisions he breached the contract. The trial court is therefore affirmed.

JAMES, C. J., and FARRIS, J., concur.

---

Petition for rehearing denied December 11, 1969.