HOMESTAKE MINING COMPANY,
Plaintiff,

v.

WASHINGTON PUBLIC POWER
SUPPLY SYSTEM, Defendant.

No. C-76-1238-CBR.

United States District Court,
N. D. California.

July 20, 1979.

Brobeck, Phleger & Harrison, John E. Sparks, Eric W. Jorgensen, San Francisco, Cal., for plaintiff.

Houghton, Cluck, Coughlin & Riley, Paul Coughlin, Phillip H. Ginsberg, Lauritz Helland, Seattle, Wash., Richard R. Quigley, Richland, Wash., McDonough, Holland, Schwartz & Allen, Sacramento, Cal., for defendant.

## MEMORANDUM OF OPINION

RENFREW, District Judge.

In this action the Court is being asked to interpret a contract involving the sale of approximately 1.5 million pounds of uranium octoxide, $U_3O_8$. Plaintiff is Homestake Mining Company ("Homestake"), a California corporation engaged in the sale of uranium. Defendant is Washington Public Power Supply System ("WPPSS"), a consortium of public utilities operating in the state of Washington. Subject matter jurisdiction is based on diversity of citizenship. See 28 U.S.C. § 1332. The parties have agreed that their contract should be interpreted in accordance with Washington law. See Contract 2808-2C, General Condition 1.17, Pl.Ex. 2, at 1A-2.

This matter came before the Court for trial in March 1978. Plaintiff was represented by Eric W. Jorgensen, John Sparks, and Tom Beatty of the firm of Brobeck, Phleger & Harrison, San Francisco, California. Defendant was represented by Phillip H. Ginsberg, Lauritz Helland, and Arthur Butler of the firm of Houghton, Cluck, Coughlin & Riley, Seattle, Washington. Having considered the testimony adduced at trial, the documentary and deposition evidence presented, the parties' post-trial briefs, and final oral argument heard on March 16, 1979, the Court renders the following opinion which shall serve as its Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

On February 18, 1972, WPPSS invited Homestake to bid on a contract to supply uranium to the initial core of WPPSS's Hanford No. 2 Project, a nuclear reactor that was to be constructed and placed in operation by the fall of 1977. Homestake responded on April 5, 1972. The bid it submitted, however, differed from WPPSS's bid specifications in one important aspect. In order to permit WPPSS to adjust the quantity of uranium purchased for its Hanford No. 2 reactor, Homestake included an "Early Delivery Alternative" that granted WPPSS an option, to be exercised prior to March 1, 1975, to vary the amount of U$_3$O$_8$ purchased by up to 150,000 pounds.[1]

Homestake's bid, including its Early Delivery Alternative, was accepted by WPPSS on May 26, 1972. Joint Pretrial Statement ("Jt.S.") at 6. On or about June 8, 1972, the parties executed an agreement memorializing the terms of their contract. Jt.S. at 6. Homestake delivered 1.5 million pounds of uranium to WPPSS in March 1973 and received payment shortly thereafter. Jt.S. at 7.

On February 6, 1975, WPPSS sought to exercise its option to purchase an additional 150,000 pounds of uranium. Jt.S. at 7–8; Pl.Ex. 73. It requested delivery for May 1976. However, on May 6, 1975, the parties agreed that Homestake could deliver this uranium at any time between May and October 1976, the date to be chosen by Homestake. Pl.Ex. 98 (Change Order No. 1).[2]

By the spring of 1976, Homestake and WPPSS came to realize that they interpreted their obligations under Contract No. 2808–2C differently. After some preliminary correspondence, WPPSS demanded that Homestake unconditionally commit itself to delivering the requested uranium. Homestake agreed to deliver by October 31, 1976, but only on the condition that WPPSS first establish that it actually *required* the uranium for the initial core of its Hanford No. 2 reactor. WPPSS denied that delivery was subject to a condition precedent or that it had to establish any particular requirements for the uranium.

On June 18, 1976, Homestake brought this suit for damages and declaratory relief. It claimed (1) that the June 8, 1972 Agreement required it to deliver only as much uranium as was necessary to fill the "initial core requirement" of WPPSS's Hanford No. 2 nuclear reactor; (2) that it had already delivered to WPPSS 300,000 pounds of uranium in excess of the initial core requirement; and (3) that there was a mutual mistake in that both Homestake and WPPSS thought that the Hanford No. 2 reactor would be completed and in operation by September 1, 1977, and that the initial core requirement would be known for certain by March 1, 1975. Homestake sought (1) a declaration that it was not obligated to sell WPPSS any uranium in excess of the initial core requirement of the Hanford No. 2 reactor; (2) a reformation of the contract so that the option would be exercisable within a reasonable time, but only at a time when the actual initial core requirement could be determined; and (3) an order requiring WPPSS to sell 300,000 pounds of uranium back to it at contract price, or pay it such damages as may be proved. Homestake has since withdrawn its third cause of action and no longer seeks to recover any uranium or monetary damages. Jt.S. at 34.

*Whether Contract No. 2808–2C is a Requirement Contract*

■ The nature of the parties' dispute can be briefly summarized. WPPSS claims that it is entitled to delivery of 150,000 pounds of uranium at the contract price of

1. Actually, Homestake submitted two bids, one that conformed to WPPSS's specifications and one that was more attractively priced and that proposed the "Early Delivery Alternative." *See* Joint Pretrial Statement ("Jt.S.") at 5; Cozzens Dep., Dec. 19, 1977, at 55.

2. Change Order No. 1 also required Homestake to give WPPSS at least five months' written notice of delivery. Pl.Ex. 98.

$7.78/lb.[3] It construes Contract No. 2808–2C as a fixed quantity contract and therefore insists that its right to delivery is not conditioned on a showing of need or requirement. Homestake's position is that Contract No. 2808–2C must be construed as a requirements contract with minimum and maximum quantity terms, and that WPPSS has no right to delivery unless it first demonstrates an actual, good-faith need for additional uranium to complete the initial core supply of the Hanford No. 2 Project. Homestake further contends that WPPSS lacks actual requirements for the uranium.

The Court's resolution of this dispute ultimately rests on its interpretation of one paragraph of Contract No. 2808–2C. That paragraph, drafted by Homestake as part of its Early Delivery Alternative, is the crucial "option clause." It states:

"In order to permit Owner, the opportunity to make an adjustment to quantities to meet fuel requirements, Contractor will grant the Owner an option, to be exercised by Owner prior to March 1, 1975, to either buy from or sell to Contractor a quantity of domestic $U_3O_8$ not to exceed 10% of the quantity purchased by Owner pursuant to this proposal. Delivery of such quantity shall be made during the month of May 1976. The price applicable to such quantity shall be Seven dollars and seventy eight cents ($7.78) per pound of $U_3O_8$ payable within thirty (30) days following delivery. Delivery point shall be specified by the buying party and surcharges shall be paid by the selling party." Pl.Ex. 36, at 1192.

If this language, considered in light of the contract as a whole,[4] is found to create a fixed quantity contract, WPPSS would be entitled to delivery. If found to create a requirements contract, WPPSS's right to demand delivery would be conditioned upon a showing that it had actual good-faith requirements for the additional uranium.

The Court's interpretation of Contract No. 2808–2C is governed by the provisions of the Uniform Commercial Code adopted by the State of Washington. See R.C.W. §§ 62A.1–101 et seq. In particular, the Court must look to Article 2 of the Code because the parties' contract is an agreement for the sale of goods. See R.C.W. §§ 62A.2–102, 2–105.

In determining whether Contract No. 2808–2C is a requirements contract, the Court is not restricted to consideration of the plain contract language. R.C.W. § 62A.2–202 permits the Court to consider course of dealing, usage of trade, and course of performance in interpreting the parties' agreement.[5] See also R.C.W. §§ 62A.1–205(1), 1–205(2), 2–208(1) (definitions). As stated by Official Comment 2 to the Uniform Commercial Code, this evidence is "admissible * * * to explain or supplement the terms of any writing stating the agreement of the parties in order that the true understanding of the parties as to the agreement may be reached." See Westinghouse Elec. v. C. X. Processing Labs, 523 F.2d 668, 677 (9 Cir. 1975); Colley v. Bi-State, Inc., 586 P.2d 908, 911 (Wash.

---

3. The market price of uranium had risen to approximately $44/lb. by the time of trial. See Tr. 110, 281.

4. Contract No. 2808–2C consists of the Contract Documents, comprised of Notice to Bidders, Instructions to Bidders, the Contract Drawings, the Technical Specifications, the General Conditions, the Special Conditions, the Addenda, the Performance and Payment Bonds, the Proposal, the Agreement, and the Change Orders. Jt.S. at 6.

5. This statute provides:

"Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented.

"(a) by course of dealing or usage of trade (RCW 62A.1–205) or by course of performance (RCW 62A.2–208); and

"(b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement."

1978). Moreover, because the contract language is susceptible of more than one construction and therefore must be considered ambiguous, the Court may consider even broader forms of extrinsic evidence in ascertaining the parties' true intent. *See* Tr. 4–5, 9; R. Anderson, Uniform Commercial Code, § 2–306:5, at 430 ("requirements" is an ambiguous term); *William C. Atwater & Co. v. Terminal Coal Corp.,* 115 F.2d 887, 888–889 (1 Cir. 1940) (same); *see also Stender v. Twin City Foods, Inc.,* 82 Wash.2d 250, 510 P.2d 221, 224 (1973); *Jacoby v. Grays Harbor Chair & Mfg. Co.,* 77 Wash.2d 911, 468 P.2d 666, 670 (Wash.1970); *Ramsey v. Sedlar,* 75 Wash.2d 901, 454 P.2d 416, 419 (Wash.1969); *Boeing Airplane Co. v. Firemen's Fund Indem. Co.,* 44 Wash.2d 488, 268 P.2d 654, 658 (Wash.1954).

In light of the contract language and the evidence submitted, the Court concludes that Contract No. 2808–2C is, at least with respect to the option clause, a requirements contract. *See* R.C.W. § 62A.2–306.[6] *See generally,* Note, Requirements Contracts: Problems of Drafting and Construction, 78 Harv.L.Rev. 1212 (1965); Annotation, Construction and Effect of Contract for Sale of Commodity to Fill Buyer's Requirements, 26 A.L.R.2d 1099 (1952). Thus, although Homestake was obligated to deliver the initial 1.5 million pounds of uranium, it had no obligation to deliver additional quantities absent a showing by WPPSS of actual, good-faith requirements. Moreover, it had no obligation to deliver more than 150,000 additional pounds regardless of WPPSS's needs. *See Utah Int'l, Inc. v. Colorado-Ute Elec. Ass'n, Inc.,* 425 F.Supp. 1093, 1096–1097 (D.Colo.1976) (interpreting a minimum-maximum requirements contract). The facts supporting this interpretation of the parties' intent are extensive.

First, the contract language repeatedly refers to WPPSS's option to purchase up to 150,000 pounds of uranium *as required* for the initial core of the Hanford No. 2 reactor. The crucial option clause explicitly states:

"In order to permit [WPPSS] the opportunity to make an adjustment to quantities *to meet fuel requirements,* [Homestake] will grant [WPPSS] an option, to be exercised by [WPPSS] prior to March 1, 1975, to either buy from or sell to [Homestake] a quantity of domestic $U_3O_8$ not to exceed 10% of the quantity purchased by [WPPSS] pursuant to this proposal." Pl.Ex. 36, at 1192 (emphasis added).

WPPSS's Notice to Bidders[7] and the title of its Bidding Documents[8] also indicate that defendant was seeking to meet its requirements in requesting bids for the initial core supply of Hanford No. 2. Furthermore, when WPPSS sought to exercise its option on February 6, 1975, it wrote to Homestake:

"*The additional quantity is required* to meet the increased feed necessary to satisfy diffusion plant requirements when the tails assay is increased to 0.275% on July 1, 1976, as recently announced by the AEC. *The total feed requirement for the WPPSS Nuclear Plant WNP–2* is currently estimated at 1,688,528 lbs. of $U_3O_8$ ." Pl.Ex. 73 (emphasis added).

*See also* Cozzens Dep., Dec. 19, 1977, at 89. Finally, Change Order No. 1, which was

---

**6.** This statute provides in relevant part:

"(1) A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded."

**7.** This notice states:

"Notice is hereby given that Washington Public Power Supply System (WPPSS), here-inafter referred to as Owner, invites sealed proposals (bids) for the supplying of natural uranium as concentrates ($U_3O_8$) or hexafluoride ($UF_6$) *for the initial core of [the Hanford No. 2] nuclear generating plant * * *."* Pl.Ex. 22, at 4684 (emphasis added).

**8.** The documents were entitled "BIDDING DOCUMENTS AND PLANS AND SPECIFICATIONS * * * *INITIAL CORE URANIUM SUPPLY* FOR WASHINGTON PUBLIC POWER SUPPLY SYSTEM HANFORD NO. 2." Pl.Ex. 22, at 4679.

drafted by WPPSS, states in its opening paragraph:

"Per the request of Homestake Mining Co., the following changes are to be made which allow Homestake to provide uranium mill concentrates of foreign origin for the portion of [WPPSS's] requirements which exceed the base contract quantity of 1,500,000 pounds *of $U_3O_8$* and to allow Homestake flexibility in scheduling delivery of such quantity." Pl.Ex. 98 (emphasis added).

Second, in addition to various references to requirements in the contract language, the Court derives support for its interpretation from evidence of the parties' pre-contract negotiations. Employees of both Homestake and WPPSS testified that Contract No. 2808–2C was drafted to satisfy WPPSS's uranium requirements for the Hanford No. 2 initial core. A. Bailey Cozzens, manager of Homestake's Uranium Division, testified at trial that WPPSS personnel had led him to understand that they were seeking to purchase only the uranium needed for the initial core supply.[9] James Worden, employed in WPPSS's Fuels Section, stated in deposition that WPPSS's bid specifications were designed to obtain only the quantity of uranium needed to meet the initial core requirements. Worden Dep., March 31, 1977, at 194. Lawrence L. Grumme, employed in WPPSS's Technical Division, acknowledged in response to a question put by the Court that it was his understanding "at the time the contract was negotiated that the uranium ore in question supplied by Homestake Mining Company was to be used in connection with the initial core." Tr. 298. Finally, Lawrence L. Humphreys, who worked for WPPSS as a supervising program engineer at the time the contract was entered into, testified in deposition that the final agreement was drafted with the intention of purchasing only that amount of uranium required for the initial core. Humphreys Dep., March 30, 1977, at 7, 33, 53–54.[10] *See also* Tr. 423 (cross-examination of Sidney M. Stoller, consultant to WPPSS).

Third, the Court is influenced in its interpretation by the parties' selection of March 1, 1975 as the date by which WPPSS's option was to be exercised. Evidence that the parties expected WPPSS's initial core requirements to be known by that date reinforces the Court's conclusion that the option clause was drafted to ensure that WPPSS could purchase up to 150,000 additional pounds of uranium only if the additional uranium was needed for the initial core of the Hanford No. 2 reactor. *See* Tr. 40–41; Cozzens Dep., *supra*, at 78–79, 150–151; Grumme Dep., Aug. 24, 1977, at 30, 36, 75–76; Humphreys Dep., *supra*, at 73, 78; *but see* Tr. 254.

Fourth, and finally, there is considerable evidence that WPPSS treated its agreement with Homestake as a requirements contract, both while evaluating Homestake's bid and while later soliciting bids for the conversion of the Homestake uranium. In its Bid Evaluation, WPPSS noted that Homestake's Early Delivery Alternative

---

**9.** This testimony correlates with evidence that he knew WPPSS had already entered into a 14-year requirements contract with another supplier for all the uranium needed for the Hanford No. 2 reloads. *See* Tr. 25–27, 31; Cozzens Dep., *supra*, at 160; Humphreys Dep., March 30, 1977, at 48; Jt.S. at 3.

**10.** To quote more fully from the Humphreys deposition:

"Q. Isn't it your recollection that the amount of uranium that you were going to ask for was that amount actually required to supply the initial core, and only that amount? Isn't that right?

"A. Yes. * * *." Humphreys Dep. at 33.

"Q. * * * Did you understand at the time that this draft went out that the intent of that document was to purchase uranium for the initial core for the Hanford No. 2 reactor"

"A. Yes.

"Q. Do you recall whether at that time it was the intent of that final draft of the document to purchase the uranium required for the initial core, and only that amount required for the initial core?

"A. That is what we wanted it for.

"Q. You didn't want to buy any more, or buy any less, you wanted to buy the specific amount that would have been required for the initial core?

"A. Well, I presume so." Humphreys Dep. at 53–54.

"means that at the time final fuel design is set, we can vary the amount of uranium delivery by as much as 150,000 pounds. This flexibility should be more than ample * * *." Pl.Ex. 40, at 2. In commenting on Homestake's bid, WPPSS's nuclear fuel consultant, the S.M. Stoller Corporation, wrote:

"The Washington Public Power Supply System issued specifications for bids to supply natural uranium *to meet the requirements for the first core* of the Hanford # 2 Unit * * *." Pl.Ex. 43, at 1 (emphasis added).

Similarly, when inviting Homestake to bid on conversion services with respect to the Hanford No. 2 uranium, WPPSS's Project Manager wrote:

"The Washington Public Power Supply System has awarded a contract to Homestake Mining Company to procure 1,500,-000 pounds of $U_3O_8$ for delivery to the conversion contractor of the Supply System in March, 1973. This material represents the major portion of $U_3O_8$ required for the initial fuel loading of Hanford No. 2. *An additional quantity of up to 150,-000 pounds of $U_3O_8$ may be delivered, if required by the Supply System for the initial core, about May, 1976.* Pl.Ex. 53 (emphasis added).[11]

Finally, WPPSS's final Bidding Documents for conversion services state:

"Owner will deliver in March, 1973, 1,500,000 pounds of the quantity of concentrates which is to be converted by Contractor for the initial core under this Contract. * * * *Any additional quantities of concentrates required for the initial core will be delivered at some later date. The additional quantity is expected to be less than 150,000 pounds of concentrates and will be delivered about May, 1976.*" Pl.Ex. 48, at 1B–1 (emphasis added).

See also Pl.Ex. 55, at A 13–4; Humphreys Dep., *supra*, at 78.

The Court has given careful consideration to WPPSS's argument that Contract No. 2808–2C is for a fixed quantity. It accepts the contention that an agreement should not be construed as a requirements contract *merely* because it includes minimum and maximum terms, a statement of purpose, and a reference to "requirements." These elements have been included in many contracts that were found to be for fixed quantities. *See, e. g., Propane Industrial Inc. v. General Motors Corp.,* 429 F.Supp. 214, 219–220 (W.D.Mo.1977); *Ready v. J. L. Fulton Co.,* 179 N.Y. 399, 72 N.E. 317, 318 (1904). However, when these elements are present, and when there is substantial evidence that the parties *intended* to enter into a requirements contract, the courts must construe their agreement accordingly. The parties' intent should of course govern. *See also* Tr. 25, 27; Stoehr Dep., Dec. 21, 1977, at 16–17.

### *Good Faith*

■ Having determined that Contract No. 2808–2C is a requirements contract and not a fixed quantity contract, the Court must consider whether WPPSS had actual, good-faith requirements sufficient for it to demand delivery of all or part of the additional uranium. *See* R.C.W. § 62A.2–306 (buyer entitled to delivery of "such actual * * * requirements as may occur in good faith"). This standard of good faith requires "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." R.C.W. § 62A.2–103(1)(b). *See generally,* E. Farnsworth, Good Faith Performance and Commercial Reasonableness under the Uniform Commercial Code, 30 U.Chi.L.Rev. 666 (1963).

---

11. WPPSS used comparable language in inviting the Allied Chemical Corporation to bid on conversion services:

"The Washington Public Power Supply System has awarded a contract to the Homestake Mining Company for 1,500,000 pounds of $U_3O_8$ to be delivered to the conversion contractor of the Supply System in March, 1973. This material represents the major portion of the total requirements of $U_3O_8$ for the initial core of Hanford No. 2. *Any future yellowcake requirements for the initial core would be delivered at some later date.*" Pl.Ex. 47 (emphasis added).

As stated by the Court during trial, and as conceded by counsel for defendant during closing argument, WPPSS's obligation to act in good faith continued throughout the transaction. *See* Tr. 192–197; Tr. of Closing Argument, at 24; Letter from Phillip H. Ginsberg, counsel for WPPSS to the Court, dated March 22, 1979; *see also* R.C.W. §§ 62A.1–203 ("Every contract or duty within this Act imposes an obligation of good faith in its performance or enforcement"), 62A.2–306, Comment 1; *Eastern Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 978 (5 Cir. 1976). Thus, to be entitled to delivery of the uranium, WPPSS must show it had actual requirements in good faith, not only on the date it exercised the option, but also at least through October 1976, the date delivery was due. *See* Pl.Ex. 73. A buyer under a requirements contract is not acting in good faith if it insists on delivery of unneeded goods, even if at the time delivery was first requested it had actual requirements.

The Court cannot find that WPPSS's continued demand for delivery was made in good faith. By the spring of 1976, WPPSS knew it would require no more than 1.3 million pounds of $U_3O_8$ for the initial core of the Hanford No. 2 reactor. *See* Worden Dep., *supra*, at 104–105; Sammis Dep., Feb. 2, 1977, at 55–57; Pl.Ex. 123; Jt.S. at 9. This estimate has not changed. WPPSS concedes that it has received more than enough uranium to meet the requirements of the initial core supply. See Tr. 278, 330; Defendant's Pretrial Memorandum at 17. As a result, the Court must conclude that WPPSS has no right to demand delivery from Homestake of any additional uranium under Contract No. 2808–2C.[12]

The Court would reach the same conclusion even if WPPSS's good-faith actual requirements had to be measured as of February 6, 1975, the date it exercised the Early Delivery Alternative option. Even assuming that a buyer need only have good-faith actual requirements on the date it requests delivery, the Court would rule in favor of plaintiff on the ground that WPPSS knew on February 6, 1975 only that *it did not know* the extent of its requirements. *Cf. Columbia Gas Transmission v. Larry H. Wright, Inc.*, 443 F.Supp. 14, 23 (S.D.Ohio 1977) (buyer should have sought a negotiated "middle-ground"); Jt.S. at 7; Pl.Ex. 56, 57.

As of January 1, 1975, WPPSS had requirements of 1.5 million pounds of $U_3O_8$ for the initial core supply of the Hanford No. 2 reactor. Tr. 266. It claims that its requirements increased five days later, however, when the Atomic Energy Commission announced a proposed increase in the transaction tails assay levels required for plants such as Hanford No. 2. *See* 40 Fed. Reg. 1117 (Jan. 6, 1975). Although it is undisputed that WPPSS's requirements for the initial core supply at Hanford No. 2 would have been increased to 1,689,000 pounds of $U_3O_8$ if this proposal were adopted, *see* Tr. 267, 304, plaintiff responds that the proposed regulation was only tentative, and not by itself sufficient to give rise to "actual * * * requirements as may occur in good faith." In light of all the evidence pertaining to WPPSS's knowledge, the Court agrees.

12. Having exercised its option, WPPSS had an affirmative obligation to notify Homestake that the uranium was no longer thought to be required, and to release Homestake from any request for delivery. Certain employees of WPPSS apparently considered doing this. There is evidence that they offered to withdraw their demand for delivery of any uranium not specifically required. *See, e. g.*, Tr. 49–50, 121, 128, 145; Pl.Ex. 89, 105; Worden Dep., *supra*, at 104–105. However, after consulting with WPPSS's legal staff, they decided to insist on delivery unconditionally. *See* Tr. 52, 138. This is not good faith. A buyer cannot insist on delivery of goods under a requirements contract when it does not need those goods for the particular business activity referred to in the contract. *See* Pl.Ex. 120; *Orange and Rockland Utilities, Inc. v. Amerada Hess Corp.*, 59 A.D.2d 110, 397 N.Y.S.2d 814, 818 (N.Y.App. Div.1977); *Asahel Wheeler Co. v. Mendleson*, 180 App.Div. 9, 167 N.Y.S. 435, 437 (N.Y.App. Div.1917) (pre-UCC); R. Anderson, *Uniform Commercial Code*, § 2–306:10, at 432 (2d ed. 1970); *cf. Massachusetts Gas & Electric Supply Corp. v. V–M Corp.*, 387 F.2d 605, 606–607 (1 Cir. 1967) (buyer breaches duty of good faith by ordering 12-month supply of goods knowing seller is about to exercise 30-day termination clause in contract).

Although some WPPSS employees testified that they believed the Atomic Energy Commission proposal would be adopted *see, e. g.,* Tr. 404; Worden Dep., *supra,* at 69–70, 90, there is also evidence that they knew it was a tentative proposal that could be withdrawn. *See, e. g.,* Worden Dep., *supra,* at 85.[13] WPPSS in fact made an active effort to have the proposal withdrawn, insofar as it submitted written comments opposing the increase in tails assay levels three months after it was proposed. *See* Tr. 292; Pl.Ex. 79; Worden Dep., *supra,* at 75–76. In addition, WPPSS knew no later than mid-February 1975 that other industry members had also submitted comments opposing the proposed increase. Worden Dep., *supra,* at 76–77. The proposed regulation was officially withdrawn on May 5, 1975. *See* 40 Fed.Reg. 19525 (May 5, 1975).

In addition to knowing that the proposed increase in tails assay levels was only tentative, WPPSS was aware at the time it exercised its option that General Electric was considering a change in the initial core design of the Hanford No. 2 reactor. Although WPPSS did not receive a formal announcement of the nature and effect of this change until June 11, 1975, Jt.S. at 9; Tr. 275,[14] it had informal notice that a proposed change was pending as early as one to two months prior to the option date. *See* Jt.S. at 8; Tr. 271, 274–275, 314; Grumme Dep., Aug. 24, 1977, at 144; Sammis Dep., Feb. 28, 1977, at 80–81. Moreover, it was aware of the general nature of General Electric's tentative changes, see, e. g., Tr. 271–272, 274–275; Pl.Ex. 71, at 4795;

Pl.Ex. 152, at 2940, and the likelihood that a change in the initial core design would affect its requirements. See, e. g., Tr. 268–269; Jt.S. at 8.[15] Final determination of the amount of $U_3O_8$ required for the initial core was still several years away. Jt.S. at 8.

On February 6, 1975, then, WPPSS knew that the Atomic Energy Commission had tentatively proposed a regulation that would increase uranium requirements and that General Electric had informally announced a design change that might decrease uranium requirements. *If* The Atomic Energy Commission's proposed regulation was adopted, and *if* General Electric's design change were not, WPPSS's requirements would exceed 1.5 million pounds of $U_3O_8$. But on February 6, WPPSS could only speculate as to the extent of its potential requirements. It simply did not know that it would require more than the contractual minimum. It therefore did not have "such actual * * * requirements as may occur in good faith."

Accordingly, for the reasons stated above,

IT IS HEREBY ORDERED that judgment shall be entered in favor of plaintiff Homestake Mining Company.

IT IS HEREBY FURTHER ORDERED that counsel for plaintiff shall prepare an appropriate form of judgment in accordance with this Memorandum of Opinion and submit it to the Court for execution within ten (10) days hereof.

13. In fact, the proposed regulation explicitly stated, in conformance with the requirements of the Administrative Procedure Act, 5 U.S.C. § 553:

"All interested persons who desire to submit written comments for consideration in connection with the proposed and planned revisions of the notice, as well as the other subjects discussed herein, should send them to the Secretary, U. S. Atomic Energy Commission, Washington, DC, 20545, on or before March 7, 1975. Unless suspended or rescinded within 60 days after the period provided for public comments as a consequence of any substantive comment received, the proposed revision will become effective on July 1, 1976. Public comments received

after the aforementioned comment period will be considered if it is practical to do so, but assurance of consideration cannot be given except as to comments filed within the period specified."

14. The effect of this change was significantly to decrease the uranium requirements for the Hanford No. 2 reactor. *See* Worden Dep., *supra,* at 88; Pl.Ex. 120.

15. This conclusion is supported by the fact that WPPSS periodically informed Homestake of its growing knowledge of the nature of General Electric's proposed changes. Tr. 342–343; *see also* Tr. 322; Pl.Ex. 92, 108.